## FREIGHTS OF THE KATE et al.

GRAY et al. v. FREIGHTS OF THE KATE et al. (five cases). BROWN et al. v. SAME (five cases). HUNTINGTON et al. v. SAME (five cases). ATLANTIC TRUST CO. v. SAME (five cases). GRAY, Receiver, v. SAME (five cases).

(District Court, S. D. New York. October 16, 1894.)

1. MARITIME CONTRACT— LETTERS OF CREDIT—HYPOTHECATION OF FREIGHTS—GENERAL LIEN.

The United States & Brazil Mail Steamship Company, owning several ships and chartering others, obtained several bankers' letters of credit in New York for the purpose of disbursing their ships in Brazil. As collateral security for payment of the drafts drawn thereon at 90 days' sight on London, they hypothecated to the bankers "all freights earned and to be earned." Before the drafts matured the company failed. *Held*, (1) that the hypothecation was a maritime contract; (2) that it created a general lien on all freights of the line, including those of vessels subsequently chartered; (3) that the bankers could enforce this lien in admiralty against the freights of vessels arriving after the failure of the company, for any drafts outstanding; (4) that this general lien was subordinate to any specific lien on the same freights for advances actually applied to assist the current voyage.

2. SAME—GUARANTORS—ORAL HYPOTHECATION.

Other similar letters of credit having been obtained through the personal guaranties of third persons, to whom the freights were likewise orally hypothecated: *Held*, that the guarantors had a similar maritime lien, enforceable in admiralty.

3. SAME—CHARTERED VESSELS—LIENS OF—PRIORITY—DAMAGES.

Under a clause in the charter giving to the shipowner a lien "on all cargoes and subfreights for any amount due under this charter": *Held*, that the shipowner was entitled to a lien on the freights of each vessel, (1) for the charter hire earned; (2) for necessary advances for the voyage; (3) for indemnity against claims for supplies to the ship or damages to cargo which the charterer was bound to pay; but (4) not to damages for the less profitable employment of the vessels during the remainder of the charter period after withdrawal by the owners from the charterers' service, in consequence of their insolvency; (5) that these liens were specific, and superior to the bankers' general lien.

4. SAME—MORTGAGE—RECEIVER—PRIORITIES.

Upon a mortgage by the charterers, of all the vessels of their line, including all leases, tolls, rents, issues and profits, which mortgage was in default before the issue of the above letters of credit, and the mortgagee never having taken possession: *Held*, that the freights earned were subject to the charterers' disposition, and that the bankers' general lien on freights under the express hypothecation, was valid as against the mortgagee, as well as against the receiver subsequently appointed.

In Admiralty. Competing claims upon the freights of five steamers chartered by the United States & Brazil Mail Steamship Company.

Convers & Kirlin, for James Gray and others.

Cary & Whitridge and W. P. Butler, for John Crosby Brown and others.

Benedict & Benedict and Maxwell Evarts, for petitioners C. P. Huntington and others.

Carter & Ledyard, Mr. Baylies, and Mr. Goodrich, for petitioner Atlantic Trust Co.

Stetson, Tracy, Jennings & Russell and Mr. Van Sinderen, for petitioner Henry W. Gray, receiver, etc., of United States & Brazil Mail S. S. Co.

BROWN, District Judge.    The above 25 libels and petitions were filed by five different claimants of the freights earned by the various steamships above named, upon the last voyage of each from Brazil to New York. The Kate arrived here on March 27, 1893; the Joshua Nicholson on March 17th; the Etherly on April 2d; the Elsie and the Enchantress about April 29th. The vessels were all running in the service of the United States & Brazil Mail Steamship Company, under written charters from their owners, made (except that of the Enchantress) in the latter part of 1892, or January, 1893. The net freights remaining after deducting port charges and the expenses of delivering the cargoes here, amount to the following sums, viz.:

Those of the Kate to $9,856.08; of the Elsie, $12,946.99; of the Etherly, $8,745.17; of the Enchantress, $11,280.26; of the Joshua Nicholson, $6,975.38.

The first five libels are by the different owners of the five steamships, to recover the unpaid charter hire, and certain other demands, for which liens upon the freights are claimed under the express provisions of the several charters.

The second five libels are by Brown Bros. & Co. for moneys paid on account of the steamship company, the charterers, upon drafts drawn by that company on letters of credit issued to it by Brown Bros. & Co., on the faith of an express hypothecation of "all the freights earned and to be earned," as "collateral security" for the payment of the drafts.

The five petitions of Huntington and Pratt are for moneys paid by them as guarantors upon three letters of credit issued by Heidelbach, Ickelheimer & Co. to the steamship company, on the alleged credit and pledge of the freights to the guarantors as security for their guaranty.

The five petitions of the Atlantic Trust Company present its claim to the freights as mortgagee of all the "ships, property, leases, tolls, income, rents, issues and profits" of the steamship company; and the five petitions of the receiver of the steamship company claim whatever is not legally vested in the other claimants.

The steamship company failed in February, 1893.    On March 18, 1893, the petitioner Henry Winthrop Gray was duly appointed by the state court temporary receiver of the company; and on March 6, 1894, this appointment was made permanent.

The charters of all the steamers were in substantially the same terms, except that of the Joshua Nicholson, which varied a little in the express lien secured to the owners.

The charter of the Kate, which is a representative of the rest, was dated December 15, 1892, and was what is commercially known as a time charter. The steamer was let to the company for two round trips from New York to Brazil and back, at the rate of 6/6 per ton per month, payable monthly in advance. She was to be

manned, officered and provisioned by the owners; while the charterer was to load her, and supply coal, etc. Clause 21 of the charter provided that "the owners shall have a lien upon all cargoes and all subfreights for any amount due under this charter." The charter of the Joshua Nicholson gave this lien for "charter hire" only, instead of for any amount due.

Shortly before the arrival of the Kate at New York at the close of her first voyage, the steamship company having failed, and in answer to inquiries having stated that it did not propose to load the steamer again, the owners, on March 20, 1893, notified the company in writing that they "hereby withdraw the steamer from your [the company's] service under the charter party, without prejudice to any claim they or their agents may have on you in pursuance of this charter party or otherwise." This notice was in accordance with a right to withdraw reserved by the fifth clause of the charter party, in case of any default in payment of the hire monthly in advance. At the time of this notice, upwards of one monthly payment was due and unpaid. On March 27th the Kate arrived at New York, whereupon the owners, without dissent by the company, took possession of her through their agents, Messrs. Winchester & Co., who delivered the cargo and collected her freights now in suit. The same notices were given as regards the four other chartered steamers; and on their arrival afterwards, similar proceedings were taken for the delivery of the cargoes and the collection of their freights; and soon afterwards the above libels were filed by the shipowners, and the freights were deposited subject to the order of the court.

The libelants, James Gray and others, shipowners, claim to recover against the freights of the vessels respectively, (a) the unpaid charter hire of each vessel up to the end of unloading, viz.: For the Kate, $4,070.85; for the Elsie, $7,909.14; for the Etherly, $7,-811; for the Enchantress, $14,482.48; for the Joshua Nicholson, $2,938.86. To the liens for charter hire there are no valid objections; though there are some counter charges presented to diminish the amounts due upon each; and in the case of the Enchantress a considerable deduction of time is claimed, on account of a breakdown in her machinery.

The shipowners further claim liens for (b) certain advances and supplies furnished by them to the charterers before and after sailing from Brazil upon the last voyages; for coal obtained at Rio, and for port charges, and extra meals at St. Thomas, where the Kate was obliged to put in for supplies, which, under the charter, the Brazil Company was required to provide; also for some mats bought of the master of the Enchantress; the expenses of replacing a bulkhead, and the master's services as purser; all of which the company agreed to pay; (c) indemnity against certain liens claimed against these steamers, some of which are in suit, for supplies furnished by material men in New York on the previous voyages out; and also against certain claims of cargo owners made against the ship for cargo damage, and for short delivery on the last voyage; which claims the charterers, it is said, are bound to pay; also (d) damages for the nonemployment of the steamers during the residue

of the charter period after the vessels were withdrawn, i. e., for the period required for another voyage to Brazil and back, or about three months; except in the case of the Enchantress, whose charter expired with the current voyage.

The libelants John Crosby Brown and others constitute the firm of Brown Bros. & Co., bankers, of this city and London, who, since 1887, have been in the habit of issuing to the steamship company letters of credit for the disbursement of its steamers at Brazilian ports upon a hypothecation of the freights. Several such letters were issued in 1892. The last of these was issued and dated on November 29, 1892, to the president of the steamship company, and forwarded to him at Rio, where he then temporarily was, for £8,000, all of which was availed of there by drafts on Brown, Shipley & Co., London, at 90 days' sight. On the back of this letter of credit, as upon previous ones, was an agreement signed by the secretary and treasurer of the company at the time the letter was issued, by which, among other things, the company agreed to put Brown Bros. & Co. of New York in funds sufficient to pay any drafts drawn upon the letter of credit, 15 days before the maturity of such drafts in London; and also agreed that "all freight moneys earned and to be earned, and the policies of insurance thereon, are hereby pledged and hypothecated to them [Brown Bros. & Co.] as collateral security for the payments as above promised; and to give them any additional security that they may require whenever they may see proper to demand it."

When this last letter of credit was issued and the hypothecation signed on November 29, 1892, only one of the above-named five chartered steamers, viz., the Enchantress, was running in the service of the company; the Kate, and the other three steamers were chartered, and entered the company's service, within the two months following. The company also owned five other steamers, which ran regularly in its service. The Kate, chartered on December 15, 1892, sailed on her first trip on December 25th. It is contended, however, in behalf of Brown Bros. & Co., that the hypothecation to them was general, and was intended to cover not only the freights of the specific voyages assisted by the drafts, but "all freights" earned by any steamers of the line, until all the drafts were paid; and that they have, therefore, by the express contract, a general lien upon all the freights of the line for the payment of any of the drafts unpaid.

Six drafts were drawn and negotiated by the company's agents at Rio under Brown Bros. & Co.'s last letter of credit. They were dated December 6, 1892, £2,000; December 16, £1,000; December 27, £1,000; January 2, 1893, £2,000; January 9, £1,000; January 21, £1,000. They were drawn on London at 90 days' sight, and became due at various dates from March 30 to May 15, 1893; and the steamship company having failed in February previous, they were all paid by Brown Bros. & Co. at maturity. The proofs show that the funds derived by the company at Rio from even the last of these drafts were all exhausted before the end of January, 1893; while none of the bills for these five chartered steamers on their last voyages were paid at Rio or Santos until in February and

March following. As their drafts, therefore, were not used to aid the chartered ships on these last voyages, Brown Bros. & Co. can have no specific lien on the freights here in question for moneys supplied to disburse the ships on the last voyages, but can only stand upon their claim of a general lien on all the freights of the line, under the terms of the express hypothecation.

Under three other letters of credit issued earlier for similar purposes and on the same terms, dated respectively, July 13, September 24, and September 29, 1892, other similar drafts were drawn and negotiated by the company, which, on its failure about February 23, 1893, Brown Bros. & Co. were obliged to take up at their maturity, from March 2 to May 4, 1893, amounting in all to $80,300.74. There were no laches on the part of Brown Bros. & Co. in proceeding against the first freights available after the company's failure, viz., those of the steamships, Advance, Allianca and Vigilancia. On February 24, 1893, a suit in equity was brought by them in the supreme court of the state to impound those freights; though they mistook the proper forum. Brown v. Gray, 70 Hun, 261, 24 N. Y. Supp. 61.

1. For the mortgagee and the receiver it is contended that Brown Bros. & Co. have no general lien upon all the freights; and that the express hypothecation gives them only a lien on the freights of the specific voyage assisted by their letters of credit, and to the extent of such assistance only; which, for convenience, I shall hereafter call a specific lien, to distinguish it from the general lien claimed.

I am satisfied, however, that a general lien was intended to be created; because the language of the hypothecation naturally imports this, and because nothing less would afford any substantial security available when needed.

It is the ordinary practice of bankers to require some kind of security for letters of credit. Here an hypothecation of the freights was the only security taken. That was the basis of the loan. The credit of 90-day sight drafts on London amounted to very nearly four months' credit after the drafts were drawn and negotiated at Rio. The bills at Rio or Santos for a particular voyage were mostly not paid, nor the drafts drawn to obtain money to pay them, until from two to four weeks after the ship sailed; and as the voyage to New York was usually but three or four weeks long, the freights of the particular voyage assisted by the drafts would usually be collected by the steamship company in New York from two to three months before those drafts became due. A specific lien on the freights of that voyage alone would, therefore, be of no value, unless the bankers should arrest the freights in advance on arrival of the vessel months before the drafts matured, and hold the fund "as collateral security for the payment of the drafts." Though the bankers, doubtless, had the right to do this on the failure of the company, under the terms of the hypothecation, it was manifestly contrary to the intent and expectation of the parties that they should arrest the freights in advance so long as the steamship company was solvent, conducting its business as usual, and paying its bills at maturity. The very object of the credit of 90 days after sight must have been to give the company

so much time in which to pay the drafts.    To arrest the specific freights in advance, and lock them up until the drafts matured, while the company was in good credit and paying its bills at maturity, would defeat the very object of the credit, and at once stop the company's business by seizing and locking up its only resources for continuing its business. During the five years' previous dealings on similar letters of credit, no such arrest in advance had been made.    The right to immediate arrest was waived, and was intended to be waived, so long as the company was solvent.    The company needed credit; the bankers needed a continuing security coextensive with the credit given.    A specific lien alone was wholly unsuited and inadequate to the needs of either party.    A general lien was necessary to the needs of both.    Evidently what the parties intended by this hypothecation was a real and substantial security, to be available when needed; and by the broad language of the contract hypothecating "all freights earned and to be earned," it seems to me they plainly intended both a specific and a general lien on all the freights of the company's line.    And if that was the intent, effect must be given to it, so far as it is lawful, and is not incompatible with the rights of others.

The hypothecation was sufficient in form, and absolute.    Christmas v. Russell, 14 Wall. 69.    It gave a vested interest in the freights from the time they began to be earned, i. e., when the vessels sailed, as "collateral security" for the payment of all drafts negotiated.    2 Story, Eq. Jur. §§ 1040, 1045.    It reserved no power of revocation or control in the debtor, inconsistent with the enforcement of it by the pledgees whenever they chose to enforce it; and it gave them the right to collect the freights on demand and notice at any time before they were otherwise lawfully appropriated. Bank v. Schuler, 120 U. S. 511, 7 Sup. Ct. 644.

2. I see nothing invalid in such a general hypothecation.    The parties, in effect, treated the vessels run by the company as constituting a line, and dealt with the line and all the vessels running in it, as with a single vessel.    See The Rosenthal, 57 Fed. 254. This was the undoubted intention.    In the negotiations, no particular steamers were named; the drafts were to disburse the company's steamers, i. e., any or all of them, as might be needed.    As between the parties, there is surely nothing invalid in procuring necessary supplies for a line of vessels by an extended hypothecation of that kind.    A master could not make such an extended hypothecation, because his authority extends only to his own vessel. But the owner is not thus limited.    "No one has ever questioned," says Butler,. J. in The Mary Morgan, 28 Fed. 199, "that an express lien may exist whenever the owner chooses to create it."    The freights belonged to the steamship company; and in thus hypothecating them, they exercised no more than an owner's ordinary right. The extended hypothecation was adapted to the modern modes of business, and was not violative of any rule of the maritime or municipal law.

3. It is not a valid objection that this general lien is more extended than that which would be given by implication of law alone, which is specific only.    For under the civil and maritime law,

hypothecations have always been recognized as created "by the mere agreement of the parties," as well as "by implication of law, or by judicial decree." Pothier de l'Hypotheque, c. 1, art. 1, § 1; 2 Bell, Comm. (3d Ed.) Nos. 1290, 1291; Macl. Shipp. (3d Ed.) 66. Accordingly maritime liens, resting wholly on express contract, have constantly been enforced. Such is the ordinary express contract of bottomry; the lien for supplies, under the English practice; the lien for charter hire upon the subfreights of a chartered vessel in possession of the charterer; the lien for supplies by material men, or for advances by the ship's agent, on dealings with the owner alone. The James Guy, 1 Ben. 112, Fed. Cas. No. 7,195; Id., 5 Blatchf. 496, Fed. Cas. No. 7,196; Id., 9 Wall. 758; The Kalorama, 10 Wall. 214; The Patapsco, 13 Wall. 329; The Stroma, 3 C. C. A. 530, 53 Fed. 281, 283; The Erastina, 50 Fed. 126. See, also, The Volunteer, 1 Sumn. 551, Fed. Cas. No. 16,991; The Kimball, 3 Wall. 37, 44.

Upon this view, Mr. Justice Thompson, in the case of The Mary, 1 Paine, 671, 674, Fed. Cas. No. 9,187, observing that there is no limitation on the authority of the owner, and that he "has the absolute control over his property, and a right to pledge his vessel for money borrowed for any purpose, to be applied to repairs, outfits, or to the purchase of the cargo," sustained a bottomry bond executed by the owner upon his vessel in the home port.

In the case of The Draco, 2 Sumn. 157, Fed. Cas. No. 4,057, Mr. Justice Story not only reaffirmed that decision, but upon a long review of the subject held that a bottomry bond may be executed by the owner in the home port for "any other maritime purposes, as well as the necessity of the ship." "In my opinion," he says, "there is not the slightest ground to uphold the doctrine that in order to constitute a bottomry bond as such, in the sense of the maritime law, it is necessary that the money should be advanced for the necessity of the ship, or for the cargo, or for the voyage. Where it is given by the owner, he may employ the money as he pleases. It is sufficient if the money be loaned on the bottomry of the ship, at the risk of the lender for the voyage." 2 Sumn. 186, Fed. Cas. No. 4,057. This goes beyond what is needed to support the present hypothecations. For if the owner may hypothecate the vessel and freight for any maritime purpose, independent of the particular voyage, plainly he may hypothecate the freights of vessels B., C. and D. to procure necessary supplies for vessel A.; and this case involves nothing more, in hypothecating all the freights of the line in order to obtain necessary supplies for each and all of its vessels.

In the case of The Jacob, 4 C. Rob. Adm. 245, Sir William Scott held that even the ordinary language of a bottomry bond, hypothecating ship and freight, would bind the freights of a subsequent voyage nearly a year afterwards, where no superior rights of third parties intervened.

There are no higher authorities in the maritime law than these. They show that it is sufficient, for a maritime privilege, that the hypothecation is for maritime purposes, (such as was the sole purpose here), though not necessarily to aid the particular voyage.

4. Nor is it a valid objection that the hypothecation covers future and prospective voyages. The case of The Jacob, last cited, is in point. See, also, The Warre, 8 Price, 269, note, and other cases below cited. Bottomry usually involves more or less of the same future element. An hypothecation of freights on bottomry is often given to enable repairs to be made to the ship before cargo is loaded, or even engaged. An hypothecation under the maritime law, is equivalent to an assignment as security under the municipal law. The law, in general, recognizes assignments of future inter- ests as a valid security from the time they come in esse. 2 Story, Eq. Jur. §§ 1040, 1040b, 1053. This has been often applied to rents, crops, wool to be grown on sheep, income, and the freights of ves- sels or railways. Mitchell v. Winslow, 2 Story, 630, Fed. Cas. No. 9,673; Beall v. White, 94 U. S. 382, 387; Congreve v. Evetts, 10 Exch. 298; McCaffrey v. Wooden, 65 N. Y. 459; Field v. Mayor, etc., 6 N. Y. 179. Cases of freights of vessels are Kimball v. Bank, 138 N. Y. 500, 34 N. E. 337; The Warre, 8 Price, 269, note; Lang- ton v. Horton, 1 Hare, 549; Douglas v. Russell, 4 Sim. 524; Leslie v. Guthrie, 1 Bing. N. C. 697; Lindsay v. Gibbs, 22 Beav. 522; Stewart v. Fry, 3 Ala. 573, 577. The claims of the present mort- gagee rest wholly upon this principle.

5. Such a general lien by express hypothecation, so far as it reaches freights of future voyages of the same vessel, extends in this case, as in the case of The Jacob, ut supra, no further than the ordinary maritime lien on the ship extends, for supplies furnished to her on a prior voyage; since that lien continues through future voy- ages, except as against subsequent bona fide purchasers or incum- brancers, until the lien is paid, or lost by laches; though it is sub- ordinate to any specific liens arising out of later voyages. The Columbia, 13 Blatchf. 521, 523, Fed. Cas. No. 3,036; The Martino Cilento, 22 Fed. 859; Nesbit v. The Amboy, 36 Fed. 926.

The same subordination must exist here as against specific liens acquired for aid to subsequent voyages of the same vessel, and to the voyages of the other vessels. The general lien is inferior in rank to the specific lien. Creditors acquiring specific liens by aiding the voyage on which the freights are earned, either of the same vessel or of other vessels of the line, have, by the maritime law, a superior privilege over any lien which has not aided the particular voyage. Thus, under the maritime law, no creditor can be injured by such a general lien, who has dealt with the ship on the credit either of the ship or of the freight; and no other creditor is in a situation to complain.

The only other party in the case who might complain of the general hypothecation, is the mortgagee; and under both the mari- time, and the municipal law, I think the mortgagee's rights are inferior to this express hypothecation.

The mortgagee represents the holders of bonds to the amount of $1,250,000, secured by three several mortgages for that amount made by the steamship company, dated July 1, 1889, and September 17, 1890, and June 5, 1891, conveying to the Atlantic Trust Com- pany, as trustee, the steamships, Finance, Advance, Allianca,

Segurança, and Vigilancia, and also all the franchises of the steamship company, and all its property then in possession, or thereafter to be acquired; and also "all leases, contracts, * * * tolls, income, rents, issues and profits arising out of said property." Freights are not mentioned by name; nor any chartered vessels, or their freights. The latter only are here in question. They are covered, if at all, by the above general words alone. The steamship company, by the terms of the mortgages, was to remain in possession till default; and after default, upon the request of bondholders to a certain amount, the trust company was authorized to take possession. Default occurred by the nonpayment of the semiannual interest that became due on January 1, 1892. No interest was thereafter paid; but no steps were taken by the bondholders or the mortgagee to obtain possession of the mortgaged vessels or their freights, nor of the freights here in question, until March, 1893, after the company's failure; and before the mortgagee could obtain possession, the vessels owned by the company were attached by the marshal, and the freights here in question were deposited subject to the order of the court. The rights of all parties must therefore, be adjudged as they existed at that time.

6. The mortgagee and receiver contend that any such general lien as above stated is inferior to their claims. The ordinary rule, however, is that a mortgage of vessels is inferior in rank to subsequent maritime or statutory liens for supplies; because the former is a nonmaritime security, while the latter are in aid of the necessities of commerce and navigation. The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498.

In cases like the present, where the mortgagee and the lienors have both alike dealt with the line as a whole, I see no reason why this rule is not as applicable to a general lien as to a specific one. If the mortgage were only upon a single vessel of the line, a general lien on all the vessels for a benefit to one only might operate inequitably upon the mortgagee's special interest. Of such a case I do not speak. But here both the mortgagee and the lienors dealt with the line as a whole. The general hypothecation added nothing to the aggregate of the particular liens, each and all of which were superior to the lien of the mortgagee. The contract for a general lien was a beneficial and a meritorious one; it was not beyond the legitimate exercise of the company's lawful power over its own freights to be earned, and of its lawful rights in managing the navigation of the line, while left in possession by the mortgagee. And as both dealt with the line as a whole in the same general way, the nonmaritime security of the mortgage must be postponed to the express maritime hypothecation, by means of which the general freights mortgaged could alone be earned, in accordance with the usual maritime rule.

The decisions of the supreme court holding that a mortgage of income in railway mortgages means the net income after paying the current expenses and charges in earning it, is a recognition by the municipal law of the same equitable principle. Fosdick v. Schall, 99 U. S. 235, 252; Burnham v. Bowen, 111 U. S. 780, 4 Sup. Ct.

675; Kneeland v. Machine Works, 140 U. S. 597, 11 Sup. Ct. 857; Trust Co. v. Souther, 107 U. S. 591, 594, 2 Sup. Ct. 295; Kimball v. Bank, 138 N. Y. 500, 34 N. E. 337. The hypothecation here was equivalent, as I have said, to an assignment at law; and being made while the mortgagor was in possession of the vessels, and made upon full consideration, as a necessary means of earning the freights, it has the highest equity in its support, as against a prior mortgagee not in possession. Bank v. Schuler, 120 U. S. 511, 516, 7 Sup. Ct. 644; Spain v. Hamilton, 1 Wall. 604, 624.

It is urged that the decisions in the cases of railway mortgages are not to be extended; citing Wood v. Safe-Deposit Co., 128 U. S. 421, 9 Sup. Ct. 131; Kneeland v. Trust Co., 136 U. S. 97, 10 Sup. Ct. 950. In the passages cited from those cases, however, the court was speaking of preferences given to unsecured claims; while the present claims are all made under express hypothecations. In the case also of Thomas v. Car Co., 149 U. S. 110, 13 Sup. Ct. 824, cited for the mortgagee, there was no hypothecation or pledge to the car company. It was a mere creditor at large.

Considering the importance of the freights of such a line, the omission to mention them in the present mortgages makes it certain that they were not specially contemplated, and somewhat doubtful whether they were designed to be included in the mortgages at all.

The form of mortgage used was the common form of railway mortgages; and if freights can fairly be held to be covered by the words, "leases, tolls, income, rents, issues and profits," which the mortgages use, it would seem to be a fair inference that the parties in using those words intended no more than their legal import and effect, as well settled at that time. The context, "rents, issues and profits," moreover, indicates that only the net income was intended; the term "profits" clearly signifies this.

In the case of Burnham v. Bowen, 111 U. S. 780, 4 Sup. Ct. 675, stress was laid upon the circumstance that the mortgagee after default had still suffered the mortgagor to remain in possession and deal with the mortgaged property as before. That is the case here. All the hypothecations in question, and every draft here presented, were made months after default in the mortgages, and while the mortgagee still suffered the mortgagor to remain in possession of the vessels, prosecuting voyages which required this money to be raised on the faith of these hypothecations. Even, therefore, if this general hypothecation were not a maritime lien at all, the appropriation of these freights by express contract as a security for the letters of credit issued upon the faith of the pledge, as well as the legal restriction of "income" to net income in mortgages of this kind, would give to the pledgees a vested equitable interest under the municipal law, according to the cases above cited, superior to that of the mortgagee out of possession, and to that of a receiver subsequently appointed.

In what has been said above as to the mortgagee's rights, it has been assumed that the mortgages had legal force to attach, or create a lien, upon the freights earned before the mortgagee came into possession of the vessels. But the decisions of the supreme

court seem to forbid the allowance of that fundamental assumption. In the cases of Gilman v. Telegraph Co., 91 U. S. 603, and of Bridge Co. v. Heidelbach, 94 U. S. 798, upon mortgages substantially identical with the present, covering the "tolls, rents, issues and profits" of the mortgaged property, and in the former case expressly including "freights" also, the supreme court adjudged that the mortgagee acquired no present interest or lien upon the income, because it had not taken possession of the mortgaged property either by itself or by a receiver appointed in its behalf. In the first case, an attaching creditor, who garnisheed the freights that were earned after a decree of foreclosure, but before a sale under it, no receiver having been appointed, was held entitled to the freights and income as against the mortgagee. Mr. Justice Swayne, in delivering the opinion of the court, after citing the words of Lord Mansfield in Chinnery v. Blackman, 3 Doug. 391, that, "until the mortgagee takes possession, the mortgagor is owner to all the world, and is entitled to all the profit made," continues as follows:

"It is clearly implied in these mortgages that the railroad company should hold possession and receive the earnings until the mortgagees should take possession, or the proper judicial authority should interpose. Possession draws after it the right to receive and apply the income. Without this the road could not be operated, and no profit could be made. Mere possession would have been useless to all concerned. The right to apply enough of the net income to operate the road will not be questioned. The amount to be so applied was within the discretion of the company. The same discretion extended to the surplus. It was for the company to decide what should be done with it. In this condition of things, the whole fund belonged to the company, and was subject to its control. It was, therefore, liable to the creditors of the company as if the mortgages did not exist."

The case of The American Bridge Co., 94 U. S. 798, is no less decisive. There the mortgagee, after default, filed a bill in equity to secure the income and freights mortgaged. A few weeks later a judgment creditor's bill was filed, claiming payment out of the same moneys. The later bill, though no lien on the fund until the bill was filed, was held entitled to priority, on the ground that the mortgagees had not obtained possession either by themselves or by the appointment of a receiver. The prior bill filed by the mortgagees, it was held, did not affect the lien acquired by the filing of the later bill, because it (the mortgagee's bill) was "an attempt to extend the mortgage to what it cannot be made to reach." "Such a proceeding," says the court, "does not create any new right. It can only enforce those which exist already. The bill of the [mortgage] trustees is as ineffectual as if the fund were any other property * * * and never within the scope of the mortgage."

I do not find the binding force of these adjudications weakened by any subsequent decisions, but rather recognized and maintained. United States Trust Co. v. Wabash W. Ry. Co., 150 U. S. 287, 306–308, 14 Sup. Ct. 86. See, also, Teal v. Walker, 111 U. S. 242, 4 Sup. Ct. 420; Trust Co. v. Shepherd, 127 U. S. 494, 507, 8 Sup. Ct. 1250. The decisions in Kimball v. Bank, 138 N. Y. 500, 34 N. E. 337; Central Trust Co. v. Wabash, St. L. & P. Ry. Co., 30 Fed. 332, 339; and Mississippi, V. & W. R. Co. v. United States Exp. Co., 81

Ill. 534,—are to the same effect. Under these decisions the necessary conclusion is, that as the trust company, the mortgagee, in this case never obtained possession of the ships or freights, the freights in question were absolutely at the disposal of the steamship company; and that its hypothecation of them in good faith, for full considera tion, and for maritime purposes, being lawful and valid, it cannot be overreached by any subsequent claim filed by the mortgagee in these proceedings.

The receiver is evidently in no better position than the mortgagee. Both, therefore, must be postponed to the liens arising upon the express hypothecations for the letters of credit, as well as to the liens under the charters.

The claims of C. P. Huntington, and of Pratt & Co.:

7. The libelants C. P. Huntington and Pratt & Co. claim to have been induced to become guarantors of three other letters of credit issued by Heidelbach, Ickelheimer & Co., of New York, to the superintendents of the steamship company at Santos and Rio for similar purposes, on the faith of the oral pledge of the ships and freights of the company. The first of the three letters of credit was for £4,000, dated October 14, 1892, and was sent by the steamship company to its agents at Santos;. the second and third were for £8,000 each, dated January 9, 1893, and February 8, 1893, respectively, and sent by the steamship company to its superintendent at Rio. These letters authorized drafts within four months on C. J. Hambro & Son, of London, at 90 days' sight, and were accompanied by similar agreements of the steamship company to provide Heidelbach, Ickelheimer & Co. in New York, with funds to pay all drafts 15 days before their maturity in London. They did not, however, contain any pledge or hypothecation either of ship or freight; but instead of that security, they were accompanied by a written personal guaranty, the first two signed by Mr. Huntington, and the last by Pratt & Co., that the steamship company would perform its agreement, and that they, the guarantors, would pay the drafts in case of the company's default.

Under the first of these three letters, two drafts were drawn and negotiated at Santos for £2,000 each, dated November 16, 1892, and December 2, 1892, which on maturity, after. the failure of the steamship company, were paid by Mr. Huntington on March 1, and March 13, 1892, respectively.

Under the second letter of January 9, 1893, five drafts, amounting in all to £8,000, were drawn and negotiated at Rio from the middle of January, 1893, to about February 1, 1893, all of which were paid by Mr. Huntington at maturity between May 6 and May 19, 1893. Under the last letter of credit of February 8, 1893, only three drafts were drawn, viz.: on February 18th and 21st and March 3d, amounting in all to £4,500, which, at maturity, were paid by Pratt & Co. from May 26 to June 5, 1893. Some of the proceeds of these drafts, as I find, were used to disburse the last voyages of the Kate, the Enchantress and the Joshua Nicholson, to which I shall refer below.

Considerable evidence has been given touching the oral hypothecation and pledge of the ships and freights as a security to Mr. Hunt-

ington and to Pratt & Co. The negotiations were between Mr. Babbige, the secretary and treasurer of the company, and Mr. Huntington, and Mr. Gates, his attorney in fact; and they have each given their evidence on this subject. The counsel for all the other parties insist that the evidence is insufficient to establish any hypothecation at all, and that the testimony is too general and indefinite to sustain any lien by contract.

While the testimony of the witnesses on this point is lacking in the precision and exactness that would be expected in written instruments of hypothecation, it is impossible, I think, to doubt these essential facts; that Mr. Huntington, who was a stockholder and a vice president of the steamship company, but took little part in the management of its affairs, and Pratt & Co., stockholders, both positively refused to make any further advances of money to the company, as they had for some time previously been doing, upon the company's general credit and responsibility, though its need of additional funds to disburse the ships in Brazil was urgently pressed upon them, because of their knowledge of the company's precarious condition; and that their consent to guaranty the three bills of credit above named was given reluctantly, and only upon the credit of at least the future freights to be earned; that these freights were repeatedly referred to in the negotiations with Mr. Babbige as their security for the guaranty asked of them, and were in effect agreed to be appropriated therefor, as in the case of Brown Bros. & Co., whose lien upon the freights on their letters of credit was well known, and was referred to in the negotiations, both parties understanding that the guarantors were to have a similar lien to that of Brown Bros. & Co. The circumstances showing the intent to create a lien, are somewhat similar to those in the case of The Kalorama, 10 Wall. 214, where Clifford, J., says:

"It is fully proved that the appellants (who had been previously disbursing the ship, as her agents) subsequent to the two trips, refused to make further advances on the credit of the owner, and that the owner expressly requested that the advances should be made on the credit of the steamer."

And the lien was consequently sustained. The cases of The Patapsco, 13 Wall. 329, and The Havana, 54 Fed. 201, have also some analogy to the present case in the known absence of any corporate responsibility beyond the ships and freights.

The knowledge which the parties possessed of the lien that Brown Bros. & Co. had always provided for in their letters of credit, and the reference to that lien in the negotiations, in connection with the other testimony, seem to me important, not only as evidence of the intent that Huntington and Pratt should have a lien, but of the general nature of the lien intended. I am satisfied that it was the common understanding that the lien should cover "the freight list," as Mr. Huntington in his testimony expressed it, and be similar to that of Brown Bros. & Co. For reasons stated in the cases of Brown v. The Allianca, 63 Fed. 726, I am satisfied that the lien does not extend to the ships in favor of either.

The transaction was not for the personal benefit or advantage of either Mr. Huntington or Pratt & Co., except as it might benefit

every other stockholder; to them personally, it was purely a burden, reluctantly undertaken for the company's benefit, and free from all suspicion of personal gain. Though Mr. Huntington was a vice president of the company, and he and Pratt & Co. were stockholders, these relations, therefore, do not invalidate such a contract, or the lien given by it (per Mr. Justice Brown, in The Murphy Tugs, 28 Fed. 429, 432), although they may afford some explanation why the contract was so loose and informal.

Nor do I perceive any lack of authority in Mr. Babbige as secretary and treasurer of the company to obtain funds upon the general pledge of all the freights. That was precisely what Mr. Babbige has been long accustomed to do in the company's behalf, in dealing with Brown Bros. & Co.; only here the hypothecation of the freights was made to Huntington and Pratt & Co., as personal guarantors of the letters of credit, instead of being given to Heidelbach, Ickelheimer & Co., the bankers, directly. The long practice by Mr. Babbige as treasurer and secretary to obtain letters of credit on these terms, must have been with the knowledge and approval of the board; and that is sufficient evidence of his authority in this instance to pledge the freights of the line as was usual theretofore.

8. The counsel for the mortgagee has renewed, with some insistence, the contention heretofore made in previous stages of these causes, that none of the transactions with Brown Bros. & Co., or with Huntington and Pratt & Co., above referred to, were maritime, or within the jurisdiction of this court, as an original cause of action; urging that the main transaction was a mere issue of letters of credit, in no respect different from a loan of money for the general business of the steamship company, and that such a loan is not maritime; that the express hypothecation was but an incident of a nonmaritime contract, not giving any different character to the transaction; and that the general character of the pledge allies it to a mortgage, which also is not maritime.

I cannot but adhere, however, to my previous rulings upon this point, which are also supported by the decision of the supreme court of the state at general term (Brown v. Gray, 70 Hun, 261, 24 N. Y. Supp. 61). A letter of credit, like a loan of money, is in itself indifferent in character; it may be maritime, or nonmaritime, according to the objects of the loan, the intent of the parties, and the circumstances attending it. Maritime contracts are contracts that pertain to maritime commerce and navigation. A letter of credit issued for the purpose of directly aiding the prosecution of current voyages, and upon the faith of the freights to be earned, as a part of the contract, is as purely maritime as a bottomry bond; and no commercial transactions are more characteristically maritime than these.

Every loan, whether of credit or of money, to assist a vessel on her voyage, and on the pledge of her freights, is presumably a maritime loan. Mr. Justice Thompson, in the case of The Mary, 1 Paine, 671–673, Fed. Cas. No. 9,187, says: "All civilians and jurists agree that marine hypothecations fall under the denomination of maritime contracts." The oral evidence strengthens the presumption

derived from the hypothecation itself, and there is not the least evidence to the contrary. Not only were the letters of credit issued by Brown Bros. & Co. all accompanied by an express hypothecation of "all freights earned and to be earned," but the other proofs show that on every application for the letters of credit there was an express representation that the moneys to be obtained thereby were to be used at Brazilian ports for the purpose of disbursing the steamers run by the company; that the letters of credit were issued for that specific purpose, and that these disbursements were necessary in order to enable the company to keep its steamers running, and to earn the freights hypothecated. From Mr. Hoffman's testimony, it is evident that the loan and the pledge were so connected and so dependent on each other, in the intent of the contract, that any substantial diversion of the funds to other uses than to disburse the ships of the line, would have been a plain departure from the contract, and would have justified a revocation of the letters. The general business of the company was itself a purely maritime business. The hypothecation of the freights was not an immaterial or collateral circumstance, but a substantial part of the contract. The present libels are to enforce that part of it; and it is that part which stamps the contract, by the clearest possible evidence, as maritime. Whether the hypothecation of the freights was general, or specific only, does not in the least affect the maritime nature of the contract of hypothecation itself, but only its rank as compared with other maritime liens.

No valid argument by analogy against the maritime character of such loans as these can be based on the nonmaritime character of mortgages of ships, except when a mortgage instrument is used to secure the loans. Even if a loan clearly maritime in its nature and intent, is to be held nonmaritime when secured by a mortgage, that could only be because a mortgage is a nonmaritime instrument, having peculiar legal incidents of its own; and because the parties, by adopting that form of security, might be presumed voluntarily to have abandoned or waived consideration of the maritime nature of the transaction, and intended to rely upon a nonmaritime security alone. Whether such a rule is sound or not, is a question not here involved; because the parties here did not adopt a mortgage security; they adopted the immemorial maritime form of an "hypothecation," and waived nothing of its maritime nature.

The company's contract with Mr. Huntington and Pratt & Co. to obtain their personal guaranties on the faith of a pledge of the freights, is of the same maritime character. The letters of credit of Heidelbach, Ickelheimer & Co., considered by themselves alone, and independently of the guaranty by Messrs. Huntington and Pratt, and the pledge of the freights therefor, would have nothing about them necessarily maritime; since those letters were not accompanied by any kind of hypothecation; nor is there any evidence before me that Heidelbach, Ickelheimer & Co. in issuing their letters had any reference to the maritime objects of the loan, or any interest in the appropriation of the moneys to the prosecution of these voyages; or that they issued their letters for that especial purpose,

or upon the faith of any credit of ship or freight; and in the absence of such evidence, their dealings should, perhaps, be treated as ordinary nonmaritime commercial dealings. But that fact does not in the least affect the nature of the additional arrangement between the steamship company and their guarantors, as respects the latter's means of indemnity; and that additional agreement, and that alone, is what is sought to be enforced in these libels and petitions. That agreement contained two essential elements, in addition to the terms of the contract with Heidelbach, Ickelheimer & Co.; first, that the proceeds of the drafts were to be used to supply necessaries to the company's vessels in foreign ports, to enable them to complete their voyages and earn freight; and secondly, that the guarantors should enable these means to be procured by their guaranty, to be given upon the credit of the freights of the line. This contract, like that with Brown Bros. & Co., was a purely maritime agreement, and within the jurisdiction of this court, whether the contract between the steamship company and Heidelbach, Ickelheimer & Co. was so or not.

I therefore find the general liens upon the freights given by the express hypothecation to Brown Bros. & Co., and to Huntington, and to Pratt & Co., to be valid, though subordinate and inferior to any particular liens acquired through aid furnished on the credit of the ship or freight, to the particular voyage on which the freights were earned.

There remain to be considered the legal priorities as between the liens of the shipowners and the liens of Brown Bros. & Co., and of Huntington and Pratt & Co., as well as some items claimed under the charter, which are in dispute.

9. Amounts due under the charter:

The charter of the Joshua Nicholson gave a lien for "charter hire" only. The other charters gave a lien on "all cargoes and all subfreights for any amount due under this charter." This clause is a common one in time charters. The words "due," and "under the charter," are words limiting the extent of the lien given. They are used in their ordinary commercial sense, and mean sums which are "due" and payable at the time when any freights are due and collectible, and which might be then lawfully collected and applied to the sums then "due" in case of the charterers' default, as distinguished from future or contingent liabilities, not then payable; and also such sums as become due under the provisions of the charter.

This lien, will, therefore, include charter hire up to the time when the vessels were withdrawn from the company's service, and such other amounts also as were then actually "due" to the shipowners from the charterers, for advances made for charterers' account, for coal, provisions, port dues, and any other sums which the provisions of the charter required the company to pay; also any sums then due and payable on account of short delivery or damage of cargo, through the fault of the steamship company, for which the company, by the terms of the charter, was bound to indemnify the ship and owners. One of these damage claims, against the Advance,

amounting to $900, has been already paid by the shipowners, and other suits on similar claims are pending. All these obligations became fixed and payable at the close of the voyage, when the sub-freights pledged were due and collectible; and they were "due" under the provisions of the charter.

10. Damages to the shipowners through the less profitable employment of the vessels by themselves during the residue of the charter period, after they had voluntarily and absolutely withdrawn the vessels from the company's service, and thus terminated the charter from that time forward, are not, I think, within the meaning of the lien clause. A claim to mere damages accruing after rescission by the owners, is not a claim for an "amount due under the charter." That clause means the contract obligations under the stipulations of the charter. There is no stipulation as to future damages in case of termination or rescission by the owners. After that withdrawal there could no longer be any action to recover the subsequent charter hire; because the service of the vessels was the consideration for the payment of hire (Compania, etc., v. Spanish American Light & Power Co., 146 U. S. 483, 498, 13 Sup. Ct. 142); and the owners voluntarily terminated the service on account of the insolvency of the company. Nothing but a doubtful claim for future possible damages remained; and for that, the charter did not provide. See In re Kelly, 51 Fed. 194.

Had the owners suffered the vessels to remain in the company's service, or subject to the company's or the receiver's orders, they could have claimed the full charter hire at the end of the charter period; but they could not have had a lien on the prior freights therefor, because not then "due."

It is the same as respects the future right to damages, if any. None were then due, for it was uncertain whether there would be any damages; or, if any, what amount. That depended upon the success of the future employment of the vessels by their owners during the remainder of the chartered period. See Bleakley v. Sullivan, 140 N. Y. 175, 35 N. E. 433. Cases like The Hermitage. 4 Blatchf. 475, Fed. Cas. No. 6,410; Blowers v. One Wire Rope Cable, 19 Fed. 444,—are not applicable, because here there was no rescission by the charterer.

It is further urged in behalf of the shipowners, that having become possessed of the freight moneys through the collection thereof by their agents, they are entitled, aside from any claim of lien under the charter, to an equitable set-off to the extent of their damages in respect to the subsequent employment of their vessels. All the cases cited in support of this doctrine, are cases of liquidated damages on contract. It seems to me unnecessary, however, to consider this point at length; because however such a right to an equitable set-off might stand as between the shipowner and the charterer, or the receiver as the representative of general creditors, no such equitable right exists as against a previous express and valid marine hypothecation of these freights. The subsequently accruing claim for mere damages cannot possibly override such an hypothecation.

11. There are certain minor claims as between the steamship

company and the shipowners, which I find should be allowed. These embrace claims in favor of the company for the value of coal returned; for advances made to the captains in Brazil; or for freight moneys collected by the captains, and not already specifically applied upon the charter hire, or otherwise. Minor claims in favor of the shipowners include any debts incurred by the company to them for supplies, or expenses for the company's use not strictly provided for by the charter, such as extra meals; $200 for replacing bulkhead in the Etherly; the value of the mats bought of the captain of the Enchantress; and the amount agreed to be paid to the captain for acting as purser; all of which I allow. The nonlien claims due and payable at the close of the voyage can be first offset against each other so far as they go. Any balance against the shipowners may be offset against their claims, if any, for prior supplies of coal or other materials in New York for which the company was bound to pay, and for cargo damage through the company's fault, for which the ship may be liable; and anything remaining may be offset against the charter hire.

12. In the case of The Enchantress, a deduction of 20 days from the owner's claim for charter hire should, I think, be made for the time the steamer was laid up in Buenos Ayres waiting for a new piston rod to supply the place of one broken on the voyage out; and also the expense of putting in to Pernambuco for the same cause; but not in this case for mere decrease of speed. The charter required the owner to maintain the ship in a condition of thorough efficiency. The temporary repair was not to be trusted, and the steamer was not in proper working condition until the new piston rod arrived. A notice that she was off hire was served on the captain at the time she was thus laid up. On this point, however, the testimony of the captain may be taken on the reference, for further consideration, under the liberty reserved at the trial.

13. Priority of liens:

(a) The liens first entitled to be paid out of the funds, after the payment of the port expenses of the vessels, including the expenses of discharging the cargo and of collecting the freight, which I understand have been already paid, are the advances made or expenses incurred for the necessities of the last voyage of each vessel after she left Brazil.

(b) Next, the specific liens for unpaid charter hire, pro rata, up to the time when the vessels were withdrawn from the company's service. These liens, expressly secured by all the charters, are superior, in my judgment, to any specific liens that Huntington and Pratt & Co. may have for moneys proved to have been supplied to disburse three of these ships on their last voyages by means of the drafts guarantied. For the use of the chartered vessels, and the shipowners' attendant lien on the freights for the charter hire, were the basis and necessary conditions of the contemplated voyages which Huntington and Pratt & Co. proposed to assist. They knew these conditions. They could not count, therefore, on using the chartered vessels, or assisting the steamship company to use them in order to earn freights as a security to them for their guaranty, ex-

cept in subordination to the conditions of the charters, and the shipowners' lien for the use of the vessels by which the freights were to be earned. This is not a case of a supply to chartered vessels in distress, and merely to bring the vessels home; such as may sometimes outrank the shipowners' lien. The repeated issue of these letters of credit, and the subsequent continuance of the voyages of the other vessels of the line after their first return to New York, negative any such exceptional case as that of distress in a foreign port, and show that the aim was to continue the navigation of the vessels in the ordinary course of the company's business, upon the security of the freights.

(c) Next come the specific liens of Mr. Huntington and of Pratt & Co. for so much of the proceeds of the drafts guarantied by them as may be proved to have been applied in Brazil to pay bills for the necessary disbursements of the chartered steamers on their last voyages, to be determined upon a reference, if not agreed on.

I find that a part only of the amounts claimed by Messrs. Huntington and Pratt was supplied to the chartered vessels so as to constitute specific liens on the freights here in question. The entire proceeds of the first letter of credit guarantied by Mr. Huntington were exhausted at Santos before January 21, 1893, and therefore none of those funds entered into the disbursements of any of the chartered vessels on their last voyages, since these bills were not paid until in February and March. Parts of the proceeds of the second and third letters of credit, as the evidence shows, were used for the voyages of three of the chartered vessels. Of these proceeds about $16,000 were sent from Rio to Santos at five different dates between January 31 and March 7, 1893, both inclusive; and from these moneys at least a part of the disbursements of the Kate and of the Enchantress at that port on their last voyages was paid, viz., the disbursements paid before March 9th, from and after which date different funds were supplied to pay all the subsequent disbursements. This fact excludes the freights of the Elsie and of the Etherly, so far as respects any specific lien, resting upon any contribution of funds towards their last voyages.

At Rio no payments for the last voyages of the chartered steamers were made before February, 1893; and all such payments made after March 6, 1893, were made from other moneys. Between those dates, however, considerable amounts were paid in disbursing the Kate and the Joshua Nicholson for their last voyages from Rio, which were derived from the second and third letters guarantied by Messrs. Huntington and Pratt; and to the extent of the moneys obtained by their guarantied letters that may be shown upon a reference to have been paid between those dates to disburse those vessels for their last voyages, as well as for the disbursements for the Kate and the Enchantress paid between January 31st and March 9th at Santos for their last voyages, they are entitled to a specific lien, which outranks the general lien of Brown Bros. & Co.

Concurrent with these specific liens, are any sums advanced for supplies furnished by the shipowners in Brazil on the steamship company's account, for the necessary disbursements of the last voyages.

(d) Next come the shipowners' claims for indemnity against liability for the supplies to the steamers in New York previous to the last voyages from Brazil; and also for indemnity against claims made against their ships for cargo damage during the last voyage, by the fault of the company or its employés, whether already paid by the owners, or not; for all which liabilities the owners have a lien under the stipulations of the charter. Liens for the supplies furnished at New York on the prior voyages, if the vessels should be held therefor, and damages to cargo on the current voyage, are, by all maritime rules, inferior in rank to necessary supplies for the last voyage. But these liens are, nevertheless, specific; and as such they take precedence of any mere general hypothecation for moneys not aiding the particular vessel, or voyage.

Against any such claims as are still pending and undetermined, the shipowners, who, under the provisions of the charters, would have liens on the freights for anything they were compelled to pay for the above causes, are entitled to be indemnified to the extent of the fund applicable thereto in case such claims are sustained, before the fund can be withdrawn by any other claimants of inferior rank. Milburn v. Lloyd, 58 Fed. 603.

(e) Whatever may remain of the freights of either of the chartered vessels after satisfying all the above described specific liens, should be applied pro rata upon the amounts remaining due and unpaid to Brown Bros. & Co., and to Mr. Huntington and Pratt & Co. on their general liens, after all their specific liens on these freights, or on any other freights or funds for the same debts, have been exhausted. As between themselves, I see no sufficient ground for giving a preference to either general lien above the other. They were in part concurrent in time; and each in part overlapped the other; and both contributed alike remotely, and in the same general way indirectly, to the funds in suit.

Decrees may be entered in conformity herewith, with an order of reference, as above stated, to report the amounts due upon the various classes of claims above specified.