## BANK OF BRITISH NORTH AMERICA v. FREIGHTS, ETC., OF THE ANSGAR.

## SAME v. FREIGHTS, ETC., OF THE HUTTON.

### (District Court, S. D. New York.   February 8, 1904.)

**1. SHIPPING—ORAL PLEDGE OF FREIGHT—VALIDITY—FOLLOWING FUND.**

A time charterer of two steamships, who rechartered the same for particular voyages, borrowed money from a bank with which to pay charter hire, under an agreement that the freight should stand pledged for its repayment. He indorsed the subcharters to the bank with memoranda of the freights and insurance policies thereon, agreeing that the bank might collect the freight, or that he would do so as its agent. At the end of the voyages he collected the freights, which he deposited in another bank in his own name, and shortly thereafter died, having in the meantime, however, checked out for his own purposes a part of the money. *Held,* that the pledge, although oral, was valid, and the money, having been collected by him as agent, became a trust fund, which did not lose its identity because deposited by the agent in his own name, nor because of his appropriation of a part thereof, but could be followed and identified as freight money.

**2. SAME—SUIT TO ENFORCE LIEN.**

The proper proceeding by the bank to enforce its lien was by a libel in admiralty against the deposit as freight money.

**3. SAME—APPROPRIATION OF TRUST FUND BY AGENT—APPLICATION OF DEPOSIT TO PAYMENT OF CHECK.**

The pledgor drew a check on the deposit to pay charter hire on a third vessel, and before the check was paid he deposited in the same account money received as freight from such vessel. *Held,* that such deposit should be applied to the payment of the check so far as it would go, leaving the trust fund unimpaired, except to the extent of the difference between the deposit and the check.

In Admiralty.

Hornblower, Byrne, Miller & Potter, for libellant.

Wheeler, Cortis & Haight, for claimant.

ADAMS, District Judge.   These actions were brought by the libellant, the Bank of British North America, to recover certain moneys

on deposit with the Bank of New York. The moneys are alleged to be the earnings and freights of the steamships Ansgar and Hutton and were deposited by Edward Perry, the charterer of the steamships, who upon their arrival in New York, collected the moneys and deposited them to his own credit in the said bank, in 1901. For a long time prior thereto, Perry had been doing business in New York under the name of Edward Perry & Co. This business consisted of hiring vessels on time charters and letting them for particular voyages. The Ansgar and Hutton were among these vessels. Their charters provided that payment of the hire of the vessels was to be made semi-monthly in advance and in default of payment, the owners should have the faculty of withdrawing the steamships from the service of the charterers; also that the owners should have liens upon all cargoes and all sub-freights for any moneys due under the charters.

The libellant is a corporation under the laws of the Kingdom of Great Britain, and does a general banking business under its charter. It had an agency in the City of New York. Perry had been doing business with it for a number of years. In 1898, he applied to the agent of the libellant to make arrangements for advances of money, which he would require from time to time to pay the hire of vessels, he would have to charter in his business, stating that the advances would be repaid on his collecting the freights and to secure the advances, the charter parties of the vessels would be endorsed over to the bank, entitling the libellant to collect the freights, but if that course should not be pursued, Perry would collect the freights as agent of the bank and secure the bank against loss of the freights by a policy of insurance in each case. In pursuance of the arrangement which followed, some sixteen advances were made from time to time, between 1898 and 1901, when Perry died.

In December, 1900, Perry wrote to the bank asking for advances against the freights of the Ansgar and Hutton, stating that the former was on her voyage home from Java or Calcutta with her hire paid to December 27th, 1900; also that the Hutton was about to begin a voyage home and her hire was paid to January 3rd, 1901. He promised to send later, the charter parties and memoranda of freights over to the bank as well as the insurance policies. The bank thereupon advanced him $20,000, which he deposited in the Bank of New York, making a note on the stub of his check book that $10,000 were advanced against the freights of the Ansgar and $10,000 against the freights of the Hutton. On the 23rd of January, 1901, he sent in to the bank the documents relating to the Ansgar, and on February 2nd, 1901, he sent in the documents relating to the Hutton. On January 30th, 1901, he asked for an additional $10,000, against the Ansgar, which were given him and he deposited them in the same bank, making an entry on his check book that they were advanced against the freights of the Ansgar. On the 15th of February, he asked for and received $20,000 more, $10,000 against the freights of each vessel, and he made an entry to such effect upon his check book. The total advances against the freights were $50,000, $30,000, against the Ansgar and $20,000, against the Hutton. The Ansgar completed her voyage on the 10th of April, 1901. Perry collected $21,000 freights for this voyage and

deposited them in the Bank of New York, between the 19th and the 24th of April.    The Hutton completed her voyage prior to April 26th and Perry collected the freights, amounting to $18,000, which were deposited, in the same bank.    Perry died on the 8th of May, without having notified the bank that he had collected the freights.

It was found, when Perry died, that his bank balance was $27,605.87. $8,802.08 of this has been released and the balance of $18,803.36 is claimed in this action by the libellant.

By an expert examination of the bank account of Perry, it is claimed by the libellant that it has been established of the $18,803.78, $803.78 consist of the freights of the Ansgar and $18,000 of the freights of the Hutton.

Out of the $10,000 received from the libellant December 26th, 1900, on account of the Ansgar's freights, $5,650.48 were paid for hire of that vessel.    Out of the $10,000 received from the libellant on January 30th, 1901, $11.42 were paid for cables on account and $3,184.06 for hire of the vessel.    Out of the $10,000 received from the libellant on the 15th of February, 1901, $3,332.72 were paid for hire of the vessel.

Out of the $10,000, received on December 26th, 1900, as against the freights of the Hutton, there were paid on account of the hire for the first half of the month ending February 3rd, 1901, $469.44; for expenses January 4th, 1901, $21.12; for the hire for the second half of said month, $3,467.11.    Out of the $10,000, advanced against the freights of the vessel on the 18th of February, 1901, there were paid $3,468, being for the second half of the month ending March 3rd, 1901. On the 4th of March, 1901, there were paid for hire $371.53, being for the first half of the month ending April 3rd, 1901.    Therefore, out of the $20,000 advanced against these freights, the sum of $7,797.20 was applied in aid of the vessel's voyage.

The testimony shows that the total sum of $18,803.78, now on deposit in the Bank of New York, consists wholly of money received from the freights of these steamships.    Of this sum, $803.78 are all that are left of the freights collected by Perry from the Ansgar.    The balance of $18,000 consists of the deposits made of the freights of the Hutton, being all the freights collected by Perry from that vessel.

The question to be determined is, whether there was a valid hypothecation of these freights and whether they can be collected by the libellant in this proceeding.

The libellant contends that the testimony shows that the libellant, in the course of its dealings with Perry, made these advances, pursuant to a request in writing from Perry in each instance, and that the evidence in the case shows an intent upon Perry's part to pledge the freights and that the advances were made upon the faith of the pledges.

The claimant contends that the intention of the parties was not to create a trust but a maritime lien upon the freights and that as the lienor did not intervene and collect the freights, but allowed them to be paid to Perry, who used some of them for his own purposes, they ceased to be freights and the lien was lost.

The answer to the claimant's contention seems to be, that, under the circumstances, Perry was collecting all the freights as the agent of the libellant and the fact that he appropriated some of the money for other

purposes, did not change the relation of the parties with respect to what was left, when the lienor did step in and assert its right. It was not necessary that the pledge, or assignment of the freights, should be in writing. In admiralty, an oral pledge is sufficient, when duly established—Freights of the Kate (D. C.) 63 Fed. 707; The Advance, 72 Fed. 793, 19 C. C. A. 194. And this is the proper form of proceeding to enforce a lien so established—American Steel Barge Co. v. Chesapeake & O. Coal Agency Co., 115 Fed. 669, 53 C. C. A. 301.

There is no necessity for ascertaining respective priorities of liens in this case, as the only party asserting a lien before the court, is the libellant. It is only essential to determine whether this constituted a valid maritime lien, to entitle the libellant to succeed.

The claimant cites and relies upon the recent English case of Taggart, Beaton & Co. v. James Fisher & Sons, 9 Aspinall's Maritime Cases, 381. There it was held that a lien on sub-freights in a time charter party to a ship-owner as security for the payment to him of the hire of the vessel, gives the ship-owner a right to stop sub-freights only before such sub-freights have been paid to the time charterer or his agent; but when once sub-freights have been paid as freight to the charterer or his agent, the ship-owner's lien or right to stop the freights is gone and he can not follow such freights after they have been paid.

The facts are quite different from those appearing in this case and the principle applied differs materially from the one involved here. There was no agency there—at least none appears from the report of the case —as I find existed here. If the freights here were paid to the charterer as agent of the libellant, and there was no termination of the relation, it would seem that it continued to the end and entitled the principal to step in at any time and assert its right to the fund. As a matter of fact, the money in this case never lost its identity as freight. In that case Lord Alverstone said:

"If we had to decide that its being freight, and received by James Fisher and Sons as freight, and being still in their hands as freight, the shipowners could not claim it because James Fisher and Sons were trustees for Tagart, Beaton and Co., I should have had very great doubt, and therefore I do not want to indorse that part of the judgment at all."

The fact that Perry drew out some of the funds for other purposes than those of these vessels is urged as a bar to the libellant's recovery, but it is now a settled doctrine that trust funds may be followed and identified by the one entitled to the possession thereof—Kustchhull v. Hallett, 13 Ch. D. 696; Mercantile Trust Co. v. St. Louis & S. F. Ry. Co. (C. C.) 99 Fed. 485; Roca v. Byrne, 145 N. Y. 182, 39 N. E. 812, 45 Am. St. Rep. 599. What money Perry drew out of the funds must be deemed to have been out of his own funds, if he had any, in preference to the trust fund—Importers & Traders' Bank v. Peters, 123 N. Y. 272, 25 N. E. 319. Therefore, such of the money advanced as remained was clearly impressed with the original trust and liable to be appropriated by the owner when it could be found and identified. There is no doubt of the identity of the fund now claimed.

One other point needs attention. On the 6th of May, Perry drew a check of $3,479.25 on the fund in bank for the hire of the steamship Bergenhuss. On the next day a check on the Seaboard National Bank

for $2,500 on account of that steamship was deposited and remains as a part of the bank balance, now claimed by the libellant as the freights of the steamships Ansgar and Hutton, on the theory that, to the extent of its amount, it replaced the $3,479.25, leaving the balance depleted to the extent of $979.25 and causing a loss to the libellant of that amount. The claimant urges that the $2,500 can not certainly be deemed a part of the fund applicable to these steamships as it was clearly Bergenhuss money. At first glance, the claimant's contention seems to be sound, but when it is considered that the money in question, partially replaced the withdrawal of $3,479.25, which otherwise would have remained on deposit to the credit of these steamships, under the theory first mentioned herein, the libellant's contention appears to be more logical, especially in view of the fact that the check for $3,479.25 was not presented or paid by the bank until the 8th of May, two days after its date. Before the actual payment of the check, the $2,500 were deposited. It appears that this amount was regarded as cash and subject to Perry's check. If the $3,479.25 transaction had not taken place, the fund would have been that much larger for the benefit of the libellant. Having taken place, however, to the detriment of the libellant, and $2,500 having been subsequently deposited on the same account, it would seem that equity should appropriate the money to repair the loss to the extent it would go and in this view the $2,500 should be applied on the payment of the May 6th check for the hire of the Bergenhuss, leaving the original account unimpaired by the transaction, beyond the loss of $979.25, the difference between the two checks.

It follows from the foregoing conclusions, that there should be decrees for the libellant.