### THE ALLIANCA.

### THE SEGURANCA.

### THE ADVANCE.

BROWN et al. v. THE ALLIANCA et al. (four libels). HUNTINGTON v. THE SEGURANCA AND FREIGHTS. HUNTINGTON et al. v. PROCEEDS OF THE ADVANCE et al. ATLANTIC TRUST CO. v. PROCEEDS OF THE SEGURANCA et al. GRAY, Receiver, v. SAME.

(District Court, S. D. New York. October 16, 1894.)

1. MARITIME LIENS—LETTERS OF CREDIT—HYPOTHECATION OF FREIGHTS—AGREEMENT FOR FURTHER SECURITY.

A steamship company in New York, in order to obtain letters of credit to disburse their ships in Brazil, hypothecated all freights, and agreed

to give "further security when required:" *Held,* that the agreement for further security was too indefinite to constitute any lien on the vessels themselves, or their proceeds; and that no such lien could be allowed upon the insufficiency of the freights to pay the drafts drawn upon the letters of credit.

2. SAME — TREASURER'S AUTHORITY TO PLEDGE VESSELS—DEALINGS WITH THE OWNER ALONE—SUBROGATION.

Upon a claim by the personal guarantors of letters of credit, that the treasurer of the steamship company, owner, had pledged both steamship vessels and freight to them for their security: *Held,* upon conflicting evidence, (1) that the pledge was only proved as respects the freights, which the treasurer had been previously accustomed to pledge in writing for similar purposes; (2) the treasurer's authority to pledge the vessels, without the action of the board of directors, questionable; (3) that as the dealings of the guarantors were wholly with the owner in New York, they had no direct implied lien upon the vessels for the moneys obtained by the sale of drafts drawn against the letters of credit in Brazil and applied to disburse the ships there in the absence of any agreement for such a lien; (4) for the same reason, and also because the moneys obtained on the drafts were the company's moneys, and because the purchasers of the drafts had no lien, the guarantors could have none by subrogation to any liens of material men in Brazil in the absence of any intent or contract to that effect in the original transaction.

3. SAME—REMNANTS AND SURPLUS OF SALE—MORTGAGEE'S CLAIMS.

There being no liens arising out of the letters of credit, either general or specific, upon the vessels, or their proceeds: *Held,* that the mortgagee was entitled to the surplus after satisfying the maritime liens already decreed.

In Admiralty.

Cary & Whitridge and W. P. Butler, for libelants John Crosby Brown and others.

Benedict & Benedict and Maxwell Evarts, for C. P. Huntington and others.

Carter & Ledyard, Mr. Baylies, and W. W. Goodrich, for petitioner Atlantic Trust Co., mortgagee.

Stetson, Tracy, Jennings & Russell and Mr. Van Sinderen, for petitioner Henry Winthrop Gray, receiver of the United States & Brazil Mail S. S. Co.

BROWN, District Judge. The steamships Advance, Allianca, Seguranca and Vigilancia were owned by the United States & Brazil Mail Steamship Company, and were run by that company between New York and ports in Brazil until the failure of the company in February, 1893. On March 18, 1893, the petitioner, Henry Winthrop Gray, was appointed by the supreme court of this state receiver of the company.

All the above claims are based upon the same transactions as were presented by the same parties in the actions against the freights of the Kate and four other chartered steamers, tried at the same time herewith; and the general rules and the points decided in those cases will be applied in these. 63 Fed. 707.

The Advance, the Allianca, and the Vigilancia all arrived in New York on their last voyage from Brazil on February 21, 1893; the Seguranca arrived on April 2d. The first three were attached by

the marshal on libels for seamen's wages, soon after arrival; and afterwards, on March 18, 1893, they were attached under the three libels first above named. The Seguranca was attached on April 2d, immediately on arrival, under the fourth above libel filed March 25th, as well as for seamen's wages. Under the libels for seamen's wages, the four steamers have been sold; the Advance, the Allianca, and the Vigilancia on April 3, 1893, realizing respectively $91,000, $83,-000, and $81,000; the Seguranca, on December 20, 1893, and realizing $125,500. From these proceeds large sums have been paid out upon the decrees for seamen's wages, and also other sums in partial payment of various decrees against the steamers for repairs, materials and supplies, which have been admitted by the parties to constitute liens upon the vessels. Considerable sums, however, are still held in reserve and unpaid upon those decrees in order to meet the pro rata share of any possible sums found due by the decrees upon the libels and petitions above named, and some other claims. The mortgagee and the receiver claim whatever is not shown to constitute maritime liens superior to their rights.

1. The letters of credit issued by Brown Bros. & Co. to the steamship company were accompanied by the latter company's hypothecation of "all the freights earned and to be earned;" but not by any hypothecation of the ships. The steamship company also at the same time agreed to give Brown Bros. & Co. any further security demanded; but the evidence does not show that any particular kind of security was named or asked for. Payment of the freights not being made to Brown Bros. & Co. when demanded, a suit in equity was begun by them against the company in the supreme court of the state, to enforce the general hypothecation to them of the freights, including those of the four steamships above stated, a few days before their above libels were filed. That court has decided at general term that as it was a maritime cause in equity, that court had no jurisdiction of the action. Brown v. Gray, 70 Hun, 261, 24 N. Y. Supp. 61.

In behalf of Brown Bros. & Co. it is now contended that the agreement to give further security on the demand thereof, and the non-payment of the freights as pledged, together with the fact that the moneys drawn upon the drafts were designed, and at least in part used, for the purpose of paying the necessary disbursements of these vessels in Brazil, and to enable them to complete their voyages, create a maritime lien upon the vessels, in addition to the express hypothecation of the freights, at least to the extent that the moneys realized upon the drafts were used in disbursing the ships at Brazilian ports.

Our law does not sustain this contention. The dealings being wholly with the owner, no maritime liens can be upheld beyond what is expressly contracted for, or shown clearly to be within the common intent of the parties at the time the letters of credit were issued; and the evidence leaves no doubt that the only lien or hypothecation then contemplated was upon the freights. In the cases of Brown v. Freights of The Seguranca, 63 Fed. 733, tried at the same time with these cases, I have sustained this hypotheca-

tion of the freights to the extent admissible upon the facts in evidence. The agreement "to give further security" would have been as truly fulfilled by giving further personal security as by giving a further maritime lien. So indefinite an agreement does not constitute of itself any lien upon the vessels, nor even any equitable assignment or appropriation, such as might be recognized on a distribution of surplus moneys; nor does it extend the maritime lien beyond that specified and agreed upon at the time. These four libels claiming liens upon the vessels are therefore dismissed.

2. The claims of Huntington et al. to the freights of the Seguranca, have been considered in the previous decisions in regard to the freights of the other steamers owned by the company. Their libel against the Seguranca, and their three petitions against the proceeds of the Advance, the Alliauca, and the Vigilancia, all present the same question, which, under my previous decision in respect to the freights of the Kate, etc., depends upon whether in the negotiations leading to the guaranty of the letters of credit issued to the steamship company by Heidelbach, Ickelheimer & Co., there was any express pledge of the steamships, or any common understanding of such a pledge as the basis of the guaranty, such as I have found existed in respect to the freights.

In the decision of the cases against the freights of the Kate, I have stated the main facts and circumstances, and here need to refer to them but briefly. Mr. Gates, who signed the first guaranty as attorney for Mr. Huntington, nowhere testifies to any other pledge than this, viz.: that "what money the ships earned was to apply in liquidation of the amount guarantied," and he testifies that the agreement upon the other letters of credit was the same. Mr. Babbige, the secretary and treasurer of the company, who alone conducted the negotiations on the company's behalf, states no other pledge, or agreed appropriation, than of the freights to be earned, and a similar lien to that of Brown Bros. & Co., which was referred to in the negotiations. Mr. Huntington, indeed, states in general terms that he was "to have a lien on the freight list and the American ships;" that such was his "expectation" and "impression;" but he was unable to give any specific conversation with Mr. Babbige to that effect, and he apparently relied to a considerable extent on his supposed rights in furnishing supplies to vessels in foreign ports. His "impression" as regards a pledge of the ships not being confirmed by Mr. Gates or by Mr. Babbige, I regard the evidence as insufficient to establish an express agreement or a "common understanding" that the vessels were hypothecated for these guaranties. The testimony by Mr. Babbige of his "assurance" to them that the freights would take care of the drafts, repels the theory that he understood he was pledging the ships as well as the freights.

I doubt, moreover, the legal authority of Mr. Babbige to pledge the vessels in this way. That was quite a different matter from a pledge of the freights alone, such as he had long been accustomed to make in obtaining letters of credit from Brown Bros. & Co. So far as appears, he had made no previous pledge of the vessels to

anyone; and there is no evidence that he had any authority to do so. A dealing in the home port so important as a hypothecation of all the ships of the line by an under officer to a superior officer of the same corporation, in the absence of proved authority from the directors, I must hold to be prima facie irregular, and not very likely to have occurred; and the making of such a pledge by Mr. Babbige I cannot hold sufficiently proved, except upon more certain and explicit evidence than is found in this case. Nor should such a pledge by his action alone be held competent or valid, I think, without some kind of previous authority, or some subsequent ratification, by the company, either express or implied from previous usage, such as existed in the case of the freights. I find, therefore, that there was no hypothecation of the vessels by agreement, but only of the freights.

3. Counsel have strenuously contended, however, that without any express contract or understanding that the guarantors should be secured by a lien or hypothecation, the mere furnishing of their money, or their credit, for the necessary disbursements of these vessels in foreign ports, would give them by operation of law a maritime lien therefor on the vessels and on the freights of the voyage assisted; i. e., either a direct lien for the money itself, as a supply necessary for the voyage; or a lien indirectly, through subrogation to the liens of those whose claims for the supply of labor or materials were paid by the moneys furnished. Many authorities are cited, and many passages from decisions are quoted giving color to this contention. But they all occur in cases where the facts are materially different from the present; and the expressions are to be limited to the state of facts before the court. In none of them were the dealings with the owner in the home port, and where, as here, an express agreement of a particular character was proved.

I cannot, for several reasons, sustain the claim of subrogation to liens of Brazilian material men, which was the only ground of lien originally set up by these claimants. No such liens have, in strictness, been proved; non constat but that the circumstances may have negatived any liens at all in their favor. There is even some evidence that supports that possibility. But assuming that some or all of the bills paid to disburse these ships in Brazil were liens in favor of the Brazilian material men, and assuming also that the transaction in New York was equivalent to a supply of moneys by Mr. Huntington and Pratt & Co. to the company's superintendent in Brazil, in order to disburse the ships there, and to enable them to complete their voyages, still the circumstances, and the negotiations in New York, strongly negative any intent at the time to loan money or credit on the security of subrogated liens; and when that fact appears, any such subrogation must be excluded. The negotiations proved show that the intent was to enable the superintendent in Brazil to prevent or to discharge liens, not to preserve them. Huntington et al. had no dealings with the lienors, as in The Cabot, Abb. Adm. 150, Fed. Cas. No. 2,277, nor with the masters or agents of the vessels assisted, as in most of the other cases of

subrogation. Their dealings were exclusively with the owner company in New York, the home port; and the prima facie presumption of a personal credit of the owner alone, applies as much against an intended subrogation to foreign liens, as against the acquisition of a primary and direct lien for the supply of the money itself. If the transaction had been with the master, and for the relief of a particular vessel; or if, being with the owner, the agreement with him, or the circumstances, had shown an intended subrogation as the basis of the loan, the subrogation should be upheld and enforced, as a direct lien would be. Here the circumstances and the negotiations show what the basis of the guaranty was, viz., a lien, as I have found, upon the freights alone. No subrogation to Brazilian liens was mentioned or referred to in the negotiations with Mr. Babbige; and afterwards, no such attention was given either to the facts raising a lien if there was any in favor of Brazilian material men, or to the evidence thereof, or to its preservation, or to the amount of such liens, as was to be expected had the least idea of any such subrogation been entertained at the time when the guaranties were given.

The transaction, moreover, was not precisely equivalent to a loan of money made by Mr. Huntington and Pratt & Co. at that time, or to a loan made in Brazil. It was, in fact, a loan of their credit only. The negotiations, the guaranty, and the final payment of the moneys by Huntington et al. about four months afterwards, were all in New York. The money to pay the bills in Brazil was raised by the superintendent there by the sale of drafts in Rio at 90 days' sight on London, although the company was able to procure the drafts only upon the credit of Mr. Huntington and Pratt & Co. as guarantors. With the moneys thus raised, the superintendent paid the bills of the different ships, and presumably discharged all liens for those bills, if there were any existing liens therefor. At that time Huntington and Pratt & Co. could not have had any lien by subrogation for the bills paid, without an agreement therefor; because the company was the primary debtor for the moneys raised by the drafts, and Huntington and Pratt & Co. were only guarantors, or sureties; they had not, as yet, advanced any of these moneys to pay the ship's bills, and they might never pay anything on the drafts; either because the steamship company itself might have paid the drafts at maturity some four months afterwards, as it was primarily bound to do; or because the guarantors themselves might have failed to pay them upon the company's default. No lien, or subrogation to any lien, could be implied by law until they had advanced money to aid the ship. Nothing but a specific agreement with the owner could keep alive for purposes of subrogation such former liens, if there were any, for bills which the company had thus paid with the proceeds of its own drafts; and there was no such agreement.

Again, the money that paid the ship's bills was not the money of Huntington and Pratt & Co.; although their guaranty enabled the company to procure it. It was the company's money, derived immediately from the persons who purchased the company's drafts in

Rio. It is certain that those purchasers had no lien, by subrogation or otherwise; because they did not buy the drafts on any credit of the ship, or with reference to any liens to which they might be subrogated; so that aside from some contract between these parties, I do not perceive how Huntington and Pratt & Co., by the mere payment of those purchased drafts, as guarantors, three or four months afterwards, could acquire any lien by subrogation. Hard v. The Advance, 63 Fed. 142.

For the same reasons mostly, I cannot sustain any direct lien independently of the contract. The dealings here, as I have said, were all with the steamship company, the owner, in New York, the home port. Neither Brown Bros. & Co., nor Huntington and Pratt & Co., had at any time any dealings whatsoever with the vessels in Brazil; nor with the masters there; nor with the material men in Brazil; nor even with the agent or superintendent there. Nor did they even send or deliver anything whatever to any one of these vessels, or to its master, in the foreign port, as was done in the cited cases of The Sarah J. Weed, 2 Low. 555, Fed. Cas. No. 12,350; The Agnes Barton, 26 Fed. 542; The Chelmsford, 34 Fed. 399; The Bombay, 38 Fed. 512; and The James Farrell, 36 Fed. 500,—to which reference has been made. In those cases it was the latter circumstance alone—the fact that the dealings of the lienors were not with the owners only, but directly with the ships and masters as well; the fact that the lienors made delivery of the supplies directly to the ship and master in a foreign port—that permitted the inference of a common intent to deal upon the credit of the ship, even though the articles were sent and delivered to the ship on the owners' request. Here those circumstances do not exist; and the dealings being exclusively with the steamship company as owner, and in the home port, the well-settled presumption, in the absence of any reference to ship or freights as a basis of credit, would be that only a personal credit of the owner was intended. In such cases a lien will be recognized when, and only when, sufficient affirmative evidence appears of a common intent to deal on the credit of the ship or freight. The James Guy, 1 Ben. 112, Fed. Cas. No. 7,195; Id., 5 Blatchf. 496, Fed. Cas. No. 7,196; Id., 9 Wall. 758; The Kalorama, 10 Wall. 204; The Patapsco, 13 Wall. 329; The Union Express, Brown, Adm. 538, Fed. Cas. No. 14,364; Thomas v. Osborn, 19 How. 22; The Francis, 21 Fed. 715, 921; The Havana, 54 Fed. 201; The Stroma, 3 C. C. A. 530, 53 Fed. 281, 283; The Kate, 56 Fed. 616.

The transaction, as respects Huntington and Pratt & Co., was a loan, not of their money, but of their credit, to the shipowners, to enable the latter to raise money to disburse the ships on the strength of their guaranty, as in Nippert v. Williams, 42 Fed. 533. For this guaranty and loan of credit, they were entitled to just such liens as the agreement at the time of the negotiations gave them, and no more. For a loan of credit as guarantor only, upon a dealing exclusively with the owner, I find no principle or authority for recognizing any other maritime or equitable lien, either directly or by subrogation, beyond what their agreement gives; and that, in this case, was for a lien on the freights alone. The libel and petition

of Huntington and Pratt & Co. as respects the proceeds of the four vessels must, therefore, be also dismissed.

The Atlantic Trust Company, as mortgagee, having a vested interest in the vessels under the mortgage for $1,250,000, and its legal title having become absolute by the default in the mortgage before the receiver's appointment, is exclusively entitled, as I find, to the surplus proceeds of these vessels, as against the other claims set forth in the above libels and petitions; but subject to the payment of any other maritime liens already decreed, or which may be hereafter decreed in pending actions.