THE ADVANCE.

THE ALLIANCA.

THE VIGILANCIA.

HUNTINGTON et al. v. PROCEEDS OF THE ADVANCE. SAME v. PROCEEDS OF THE ALLIANCA. SAME v. PROCEEDS OF THE VIGILANCIA.

(Circuit Court of Appeals, Second Circuit. March 17, 1896.)

1. MARITIME CONTRACTS—LETTERS OF CREDIT—GUARANTY.

A letter of credit may be maritime or nonmaritime, according to the objects of the loan, the intent of the parties, and the circumstances attending it; and consequently a contract guarantying, on the express security of a vessel's freights, a letter of credit issued to enable her to pay her debts in a foreign port, and enable her to return home, is a maritime contract, enforceable in the admiralty.

2. MARITIME LIENS—SUPPLIES—CONTRACT IN HOME PORT.

The owner can, by express contract made in the home port, create a maritime lien for a loan of credit, whereby the vessel is enabled to procure necessary supplies in a foreign port; but in such case the prima facie presumption of necessity for the credit of the ship which arises when supplies are furnished in a foreign port on the sole order of the master does not apply, and on that question the claimant of the lien has the affirmative.

3. SAME.

A guaranty of letters of credit, in the home port, on the request of the known insolvent owner, for the purpose of enabling the vessel to pay her debts in a foreign port, and thereby escape detention, creates no

maritime lien on the vessel herself, where there was an express contract for a lien on the freights alone. 63 Fed. 726, affirmed.

4. SAME—SUBROGATION.

One giving a guaranty under an express contract whereby he is to have a lien on the freight alone is not subrogated to the rights of lienors in a foreign port, whose claims are paid with money obtained on the strength of the guaranty.

Appeal from the District Court of the United States for the Southern District of New York.

These were petitions by Collis P. Huntington and Pratt & Co. against the proceeds, respectively, of the steamships Advance, Allianca, and Vigilancia, to assert an alleged lien arising out of a contract whereby libelants guarantied payment of certain letters of credit. The district court dismissed the petition (63 Fed. 726), and the petitioners have appealed.

Robert D. Benedict and Maxwell Evarts, for appellants.

Lewis Cass Ledyard and Chas. D. Wetmore, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The United States & Brazil Mail Steamship Company, a corporation organized under the laws of the state of New York, had been engaged for some years prior to October, 1892, in the business of running a line of passenger and freight steam vessels between the city of New York and different ports in Brazil, with increasingly poor pecuniary success. Mr. Collis P. Huntington was a stockholder, a director, and the vice president of the company, but without any active share in its management, except to lend it money in its times of need, which he was in the habit of doing to a very large amount. He had advanced, during five or six years before October, 1892, about $400,000. Charles Pratt & Co., of Brooklyn, were stockholders, who, like Mr. Huntington, loaned or advanced money largely to the corporation. Each of these persons was aware prior to October, 1892, that the corporation was insolvent, and in great financial straits, and had concluded to lend it no more money without security. Prior to October, 1892, the corporation had been in the habit of disbursing its ships in Brazil, with moneys derived from letters of credit issued by Brown Bros. & Co., bankers of New York, secured by a written hypothecation of the freight moneys of the line. This firm apparently grew restive and indisposed to increase their line of credit to the corporation, and it therefore became indispensable that it should obtain financial assistance elsewhere, for the purpose of enabling its vessels to pay their debts in Brazil, and return to New York. They must be kept in motion in order to keep the corporation alive. In this state of things, Mr. Huntington and Pratt & Co., in New York, at the solicitation of the steamship company, were induced to become guarantors of three other letters of credit issued by Heidelbach, Ickelheimer & Co., of New York, to the superintendents of the corporation at Santos and Rio, for the purposes of disbursing the vessels, and preventing their detention and sale at those ports. The whole history of this transaction in regard to guaranties, as given by the witnesses and as indicated by the circumstances, shows that

they were furnished in reliance upon the oral promise or pledge, in New York, of some security in addition to the bare credit of the steamship company. The particulars in regard to the use which was made of these letters are stated by the district judge in the case of the libels and petitions of different claimants of the freights of the vessels, as follows (Freights of The Kate, 63 Fed. 707):

"The first of the three letters of credit was for £4,000, dated October 14, 1892, and was sent by the steamship company to its agent at Santos; the second and third were for £8,000 each, dated January 9, 1893, and February 8, 1893, respectively, and sent by the steamship company to its superintendent at Rio. These letters authorized drafts within four months on C. J. Hambro & Son, of London, at 90 days' sight, and were accompanied by similar agreements of the steamship company to provide Heidelbach, Ickelheimer & Co., in New York, with funds to pay all drafts fifteen days before their maturity in London. They did not, however, contain any pledge or hypothecation either of ship or freight; but, instead of that security, they were accompanied by a written personal guaranty, the first two signed by Mr. Huntington, and the last by Pratt & Co., that the steamship company would perform its agreement, and that they, the guarantors, would pay the drafts in case of the company's default. Under the first of these three letters two drafts were drawn and negotiated at Santos, for £2,000 each, dated November 16, 1892, and December 2, 1892, which, on maturity, after the failure of the steamship company, were paid by Mr. Huntington, on March 1 and March 13, 1892, respectively. Under the second letter of January 9, 1893, five drafts, amounting in all to £8,000, were drawn and negotiated at Rio, from the middle of January, 1893, to about February 1, 1893, all of which were paid by Mr. Huntington at maturity, between May 6 and May 19, 1893. Under the last letter of credit of February 8, 1893, only three drafts were drawn, viz. on February 18th and 21st, and March 3d, amounting in all to £4,500, which, at maturity, were paid by Pratt & Co., from May 26 to June 5, 1893."

The steamship company failed in February, 1893. On March 18, 1893, Henry Winthrop Gray was appointed by the proper state court temporary receiver of the company, and this appointment was made permanent March 6, 1894. The steamships Advance, Allianca, and Vigilancia, owned by the company, arrived in New York on their last voyage from Brazil on February 21, 1893; were soon attached on libels for seamen's wages; and on March 18, 1893, were attached under libels in favor of Brown Bros. & Co. The vessels were sold, and the proceeds were paid into the registry of the district court, when a mass of litigation, consisting of more than 30 cases, ensued, at the instance of divers persons, who claimed maritime liens upon the freights or upon the vessels and their proceeds. Among those cases were five petitions of the present petitioners, to recover, from the freight moneys which had been received by the steamship company, the moneys paid by them upon their guaranties, it being alleged that the freights were a security which was given when the guaranties were signed, and upon which a maritime lien existed. These petitions were granted, upon a finding that the freights were expressly hypothecated to the petitioners, and that the lien upon them was maritime in its character. From the decree in that class of cases, no appeal was taken; the amount in controversy was divided between the lienors by agreement; and the present petitioners received, as their part of the fund, enough to pay the amount due upon the guaranty of the first letter of credit. The petitions which are the subject of the present appeals were

brought by Mr. Huntington and Pratt & Co., to obtain a decree for the repayment to them, from the avails of the Advance, the Allianca, and the Vigilancia, of the amount which they paid upon their guaranties, and which had been used, by means of the letters of credit, to pay for supplies and materials furnished the respective vessels in Brazilian ports, upon the ground that the petitioners were subrogated to the liens against the steamships for such supplies and materials. Upon the hearing before the district court, the questions of fact resolved themselves into the questions whether the guaranties were given expressly upon the credit of both freights and vessels, and whether, from the known circumstances of the transactions, the fact of a credit upon the vessels could not be fairly inferred. The district judge found that there was no pledge of the vessels, and dismissed the petitions. 63 Fed. 726. From those decrees, these appeals were taken.

The claimant and appellee is the Atlantic Trust Company, to which corporation, as trustee, the steamship company conveyed, by three mortgages, dated July 1, 1889, September 17, 1890, and June 5, 1891, the steamships named in these petitions, and the Finance and Seguranca, and the franchises of the company, and its property then in possession or thereafter to be acquired, to secure the payment of bonds to the amount of $1,250,000. Default in the payment of interest occurred January 1, 1892. Before the mortgagee could gain possession of these vessels, they were attached by some of the libelants.

It appears from the foregoing facts that the cases stand on this wise: At the home port of a line of steamships which are in a foreign port, the insolvent owners of the vessels obtain from the petitioners, who know the owners' insolvent condition, indispensable means, by the aid of which the owners are enabled to discharge the liens resting upon the vessels in the foreign port, and to continue them in their business as seagoing vessels, upon the security either of the vessels and their freights, or of the freights alone, and the petitioners have paid the liabilities which they assumed upon the faith of the security. The mortgagee raises the preliminary question whether the security which the petitioners claim to have received can be regarded as a maritime lien, and says that the transaction with Heidelbach, Ickelheimer & Co. was an ordinary commercial transaction, not maritime in its character; that the guaranty was merely incidental thereto; was one simply of suretyship of letters of credit; that no money was to be paid in Brazil upon the letters, but was to be obtained there by means of drafts within four months upon named bankers of London, at 90 days' sight; that the guarantors' promise to ultimately pay these drafts is very remotely connected with the maritime destination of the money to be raised in Brazil; and that, as a result of these considerations, the guarantors' security, if any there was, was not a maritime lien.

It is obvious that the form by which, or the mode in which, the letters of credit were to be made available in Brazil, and the form in which Heidelbach, Ickelheimer & Co. furnished money to the steam-

ship company, whether by letter of credit or by a direct loan, are immaterial. The form adopted was the means by which the steamship company obtained money in Brazil to pay the Brazilian debts of the vessel.

The answer to the main question, viz. whether the transaction, so far as the petitioners and the steamship company are concerned, was a maritime contract, is so clearly stated in the opinion of the district judge in Freights of The Kate, 63 Fed. 707, that further discussion is unnecessary. The district judge said:

"A letter of credit, like a loan of money, is in itself indifferent in character. It may be maritime, or nonmaritime, according to the objects of the loan, the intent of the parties, and the circumstances attending it. Maritime contracts are contracts that pertain to maritime commerce and navigation. A letter of credit issued for the purpose of directly aiding the prosecution of current voyages, and upon the faith of the freights to be earned, as a part of the contract, is as purely maritime as a bottomry bond; and no commercial transactions are more characteristically maritime than these. Every loan, whether of credit or of money, to assist a vessel on her voyage, and on the pledge of her freights, is presumably a maritime loan. Mr. Justice Thompson, in the case of The Mary, 1 Paine, 671–673, Fed. Cas. No. 9,187, says: 'All civilians and jurists agree that maritime hypothecations fall under the denomination of maritime contracts.'"

After sustaining the maritime character of the contract with Brown Bros. & Co. by which the freights were expressly hypothecated to secure the repayment of the moneys advanced upon their letters of credit, and the maritime nature of the lien resulting from such hypothecation, the district judge further said:

"The company's contract with Mr. Huntington and Pratt & Co. to obtain their personal guaranties on the faith of a pledge of the freights is of the same maritime character. The letters of credit of Heidelbach, Ickelheimer & Co., considered by themselves alone, and independently of the guaranty by Messrs. Huntington and Pratt, and the pledge of the freights therefor, would have nothing about them necessarily maritime, since those letters were not accompanied by any kind of hypothecation; nor is there any evidence before me that Heidelbach, Ickelheimer & Co., in issuing their letters, had any reference to the maritime objects of the loan, or any interest in the appropriation of the moneys to the prosecution of these voyages, or that they issued their letters for that especial purpose, or upon the faith of any credit of ship or freight; and, in the absence of such evidence, their dealings should, perhaps, be treated as ordinary nonmaritime commercial dealings. But that fact does not in the least affect the nature of the additional arrangement between the steamship company and their guarantors as respects the latter's means of indemnity; and that additional agreement, and that alone, is what is sought to be enforced in these libels and petitions. That agreement contained two essential elements, in addition to the terms of the contract with Heidelbach, Ickelheimer & Co.: First, that the proceeds of the drafts were to be used to supply necessaries to the company's vessels in foreign ports, to enable them to complete their voyages and earn freight; and, secondly, that the guarantors should enable these means to be procured by their guaranty, to be given upon the credit of the freights of the line. This contract, like that with Brown Brothers & Co., was a purely maritime agreement, and within the jurisdiction of this court, whether the contract between the steamship company and Heidelbach, Ickelheimer & Co. was so or not."

The question of the extent of the security upon which the guaranties were given is next to be considered. It is to be premised that it is not doubted that the owners can create a maritime lien

upon their vessels for necessary supplies furnished to them in a foreign port upon the credit of the vessels, and that the oral contract or agreement between the owners and lienors, whereby such maritime lien was created, may be made in the home port. It is also well understood that the same prima facie presumption of necessity for the credit of the ship which is applicable in the case of supplies furnished in a foreign port upon the sole order of the master does not apply in the case of supplies furnished in such port upon the express direction of the known owner, and therefore, in the absence of presumptions, the question is one in which the petitioners take the affirmative. At the threshold of the inquiry, three facts are manifest: Firstly, an absolute necessity, recognized by each, and consequent upon the known insolvency of the steamship company, of a maritime lien of some sort; secondly, that a maritime lien was given, which the district court has found to be, at least, upon the freights,—a conclusion which has now become res adjudicata, and in which our examination of the case leads to a full concurrence; thirdly, and one of great importance, that whatever security was given was expressly given. The contract between the parties was an express contract, entered into between the owner of the vessels and Mr. Huntington. The antecedent circumstances are valuable for the purpose of throwing light upon the probabilities of the contract, and in the ascertainment of what one party would have naturally proffered and the other party would naturally have insisted upon; but whereas, in many cases, courts, in consequence of the silence of the parties when the advances were made, or their subsequent forgetfulness of what occurred, are compelled to look at the inferences to be drawn from their conduct and acts, in view of the known insolvency of the owner, little resort can be had in this case to that class of evidence. There is a class of cases, in regard to maritime liens for supplies furnished to a vessel in a foreign port at the request of the owners or of their agent (of which The James Guy, 1 Ben. 112, Fed. Cas. No. 7,195, and 9 Wall. 758, and The Patapsco, 13 Wall. 329, are examples), in which there was not apparently an express contract between the owners and the material men for the credit of the vessel, but in which the lienors' knowledge of the insolvency of the owner was regarded as a very significant fact, from which the inference could naturally be drawn that credit must have been given in part to the vessel. In this case a court is able to ascertain what the owner offered, and what the lienors apparently accepted, as security, at the time when the contract was entered into. The terms of the express contract, when they can be accurately ascertained, must preclude the idea of a contract to be ascertained by inference for another and different security from the one contained in the express contract. It is true that Huntington's knowledge of the utter insolvency of the steamship company is important to show that he naturally would have wanted to get all the security which was available, but, if the evidence shows that he did content himself with the security of the freights, his lien must rest where he placed it.

The entire negotiations with the petitioners in regard to the three letters of credit, so far as the steamship company was concerned, were conducted by Mr. Babbidge, its secretary and treasurer. The conference in regard to the first guaranty was had with Mr. Pratt and Mr. Gates, who was Mr. Huntington's general assistant, and who, having a power of attorney from Huntington, signed, in his absence, the first guaranty. Mr. Huntington personally had conversations with Mr. Babbidge, which resulted in the guaranty upon the second and third letters of credit. Mr. Gates' information in regard to the result of these interviews was derived from the subsequent statements of Huntington and Babbidge. Mr. Pratt was not called as a witness by either party, so that the evidence in regard to the security must be derived from the three persons named. Inasmuch as the money paid by the guarantors upon the first letter of credit has been repaid from the moneys from the freights which were received as the result of a compromise agreement between all the parties, after the decree in the freight-money cases had been entered, it is not indispensable to know what the security was which Mr. Gates accepted, but knowledge of the character of the contract in which he participated is valuable as showing the probable character of the steamship company's proposition for security upon the next request for a guaranty; and, furthermore, the three contracts are closely connected in the mind of Mr. Babbidge, who regards the second and third as reproductions of the first. The first guaranty was obtained from Mr. Gates to meet the demands of the bankers for a guarantor, and it was then understood that Pratt and Huntington should, as between themselves, equally bear the burden upon that guaranty and any future similar obligations. It is apparent from the testimony of Babbidge that a great deal of persuasion was required to bring them to furnish the first guaranty, and that he informed them that, as Brown Bros. & Co. had a lien upon the freights for their letters of credit, he expected they would have a similar lien also. Gates corroborates this by the declaration that the earnings of the ship, on the voyage to be completed by means of the fund to be raised by the letter of credit, were to be security for the payment of any money which might be called for under that guaranty. The pledge of the freights was the only security offered, asked for, or given, when the first guaranty was signed. The testimony of Babbidge in regard to the conversations between himself and Huntington when the second and third guaranties were signed is of like import. It is not as positive in regard to a pledge of the freights, but it is apparent that, as the transactions lie in his memory, the negotiations proceeded in the same progressive steps as before. The recollection of Mr. Huntington, as disclosed in his testimony, is less clear and precise than that of Mr. Babbidge. His testimony is, indeed, in general terms, that he was to have a lien on the American ships and the freight list, but it is apparent that there is not in his mind a vivid remembrance of the negotiations. He remembers his conclusion or

supposition in regard to his security,—a conclusion or expectation which was in some measure founded upon his belief in the rights of material men who aided ships in foreign ports. That the first guaranty was not based upon or accompanied by a lien upon the vessels is perfectly manifest from the testimony of two of the parties to the transaction, each of whom is and was friendly to Mr. Huntington; and the probabilities are exceedingly strong that the second and third guaranties were not accompanied by a lien of a different character.

The appellants insist that a decree should have been rendered in favor of the petitioners upon the ground that the money which was obtained upon the strength of their guaranty went to pay and discharge maritime liens upon the vessels in a foreign port; that, by operation of law, these liens were assigned to them; and that they are subrogated to the rights of those lienors whose claims were paid by the money which they indirectly furnished. There is no adequate ground for this conclusion, because in this case there can be no implied assignments by operation of law, no succession to the position of the Brazilian lienors, and no subrogation to their rights, because the contract of lien under which the guaranties were given was expressly limited to the freights. A court of admiralty is compelled, there. re, to look at the contract; and, if it does, the right of subrogation disappears, for nothing in the negotiations supports the idea of subrogated liens. Inasmuch as the contract for lien, between the owner and the guarantor, was an express one, the lien which it created upon one thing cannot be supplemented by a lien, arising by operation of law, upon a different thing.

We concur in the conclusion of the district judge that, "for this guaranty and loan of credit, they [the guarantors] were entitled to just such liens as the agreement at the time of the negotiations gave them, and no more. For a loan of credit as guarantor only, upon a dealing exclusively with the owner, I find no principle or authority for recognizing any other maritime or equitable lien, either directly or by subrogation, beyond what their agreement gives; and that, in this case, was for a lien on the freights alone."

The decrees of the district court dismissing the petitions of Huntington and Pratt & Co., as respects the proceeds of the three vessels which have been named, are affirmed, with costs of this court.