## COMMONWEALTH TRUST CO. OF PITTSBURGH v. AMERICAN MOTORSHIP CO., Inc., et al.

(Circuit Court of Appeals, Second Circuit. December 11, 1922.)

### No. 19.

**1. Mortgages 151(1)—Purchaser of coupons held not "interested in trusts," so as to be entitled to priority for advances.**

Within a provision in a mortgage securing a bond issue which gave priority to certain advances made by one who was interested in the trusts, the interest must be a financial interest, and not the mere moral interest of a seller of the bonds endeavoring to safeguard the bondholders, so that such seller was not entitled under that clause to priority for a loan made after it had bought interest coupons which the company redeemed, in the absence of a showing that the coupons were not redeemed at the time the loan was made.

**2. Receivers 152—Orders held not to give priority from proceeds of insurance for loan.**

Orders in a receivership proceeding, directing the receiver to secure loans made to release the vessel from the foreign liens by a pledge of the freight to be earned, did not entitle the loan to priority in payment from the proceeds of insurance after the loss of the vessel, nor did an order made after the money was loaned, directing the receiver to procure further loans for the purpose of paying the insurance policies and to issue his certificates therefor.

**3. Receivers 118—Court can carry out promise of receiver with consent of mortgagee to give priority to advances.**

Where a receiver, with the consent of the mortgagee, who was trustee for the bondholders, promised to secure priority for amounts loaned to him to release the mortgaged vessel from foreign liens and

pay the insurance thereon, the court could thereafter, in the exercise of sound discretion, authorize the issuance of receiver's certificates to repay the amount so loaned.

**4. Receivers ⬥120—Consent of bondholders not parties to suit is unnecessary for order giving priority to advances.**

In a suit to foreclose a mortgage securing corporate bonds, where the mortgagee, as trustee for the bondholders, was the sole complainant, it was unnecessary to obtain the consent of the bondholders, in addition to the consent of the mortgagee, before authorizing the issuance of receiver's certificates for money loaned to him which would have priority over the bonds.

**5. Mortgages ⬥151(1)—Purchaser of overdue interest coupons held "interested in trusts," and entitled to priority of advances.**

Notwithstanding a provision in a mortgage securing corporate bonds that a purchaser of interest coupons after maturity should not be entitled to payment until after full payment of the principal and of the interest coupons not so transferred, a purchaser of such coupons was one "interested in the trusts," within a provision of the mortgage giving priority to advances on account of taxes, payments, or otherwise.

**6. Mortgages ⬥151(1)—Provision giving priority to advances held to benefit person other than trustee.**

Provision in mortgage securing corporate bonds that the owner would pay the trustee the amount of advances by the trustee, or any one interested in the trust, does not limit the benefit of that provision to the trustee, but entitles a holder of coupons, who made such advances for the preservation of the property, to priority therefor.

**7. Mortgages ⬥151(1)—Order to assign freight held not to defeat right under mortgage to priority for advancements.**

An order directing a receiver to assign freights to be earned by the mortgaged vessel as security for advances made for the satisfaction of liens against the vessel and the payment of insurance thereon does not defeat the right of the party making the advances to the priority given him for such advances by the terms of the mortgage.

**8. Mortgages ⬥183—Right to priority for advances held not waived.**

A seller of bonds secured by mortgage on a ship, which thereafter purchased interest coupons from the bondholders and made advances to the receiver for the purpose of preserving the ship, did not waive its right to priority for such advances under the terms of the mortgage, though the procedure whereby the advances were made was informal, and the claim of right to priority under the mortgage was not brought to the attention of the court in the original petition for priority.

**9. Mortgages ⬥151(1)—Bond company advancing sums to protect vessel held equitably entitled to priority over bondholders.**

A bond company, which had sold bonds secured by mortgage on a ship, and which thereafter, in discharge of its obligation, which was only moral, to safeguard those who bought bonds from it, purchased interest coupons on the bonds and made advances to the receiver to protect the vessel from foreign liens and to pay the insurance premiums thereon, is equitably entitled to priority for such advances out of the proceeds of the insurance on the vessel.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Commonwealth Trust Company of Pittsburgh against the American Motorship Company, Inc. From an order directing the receiver of the defendant corporation to execute and deliver to Lyon, Singer & Co. receiver's certificates in designated amounts,

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the complainant and J. F. Collins and others, as a committee of bond-holders, appeal. Affirmed.

Mark W. Maclay, of New York City (Mark W. Maclay, of New York City, and J. Merrill Wright, of Pittsburgh, Pa., of counsel), for appellants.

Seibert & Riggs, of New York City (R. E. T. Riggs, of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge. In some respects this record is informal, and does not show that any motion to intervene was made by the bond-holders' protective committee nor any order entered permitting inter-vention; but as the trustee has appealed, and as all parties to the litiga-tion are anxious that the order below be reviewed upon its merits, in order that the receivership estate may be speedily wound up, we shall not pause to consider technical details. We take this opportunity, how-ever, of calling attention to the importance and desirability of compli-ance with the Supreme Court equity rules, and particularly, in this class of case, with rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii).

The order appealed from was made on the application of Lyon, Singer & Co. (hereinafter called Lyon Co.) for an order directing the receiver of American Motorship Company, Inc. (hereinafter called American Co.) to execute and deliver to Lyon Co. receiver's certifi-cates in certain amounts, infra. The procedure was as follows:

First, there was a motion made on the petition of Lyon Co., which was denied for reasons hereinafter stated; and, secondly, there was a motion for reargument and for leave to file an amended petition. The motion for reargument was denied, but the relief prayed for in the amended petition was granted, and an order entered accordingly. An answer was not interposed to either petition and the allegations of these two petitions, therefore, stand admitted.

The original petition did not display the facts as fully as the amended petition, and particularly did not set forth a provision of the trust mortgage upon which Lyon Co. now largely relies. The result was that the District Court denied the application of Lyon Co. on the au-thority of The Advance, 63 Fed. 726, 72 Fed. 793, 19 C. C. A. 194; and 72 Fed. 791, 19 C. C. A. 192, and also on the ground that no money was advanced upon the faith of an order of August 6, 1920, infra. In these circumstances, Lyon Co. moved for reargument on an amended petition. The essential facts appearing in the amended petition follow.

Lyon Co. is a Pennsylvania corporation engaged in the business of buying and selling securities. American Co. made a mortgage dated May 17, 1919, to plaintiff as trustee to secure an issue of $250,000 7 per cent. bonds upon the American motorship Trolltind. These bonds were payable on May 15, 1922, with sinking fund payments as follows: $62,500 on November 15, 1919, and also on May 15, 1920, and $33,-125 on November 15, 1920, May 15, 1921, and November 15, 1921. Lyon Co. purchased these bonds from American Co. and sold them to

its customers.   The mortgage contained a provision known as article IV, section 8, as follows:

"The owner will pay to the trustee all expenses incurred by the trustee in connection with this indenture and/or the enforcement thereof and/ or the execution of the trusts hereof and all sums of money, if any, that shall have been paid by the trustee, or by any person interested in the trusts hereof, on account of any taxes, charges, assessments, liens, or insurance premiums or payments, or otherwise, in case of any default in the payment thereof on the part of the owner, with interest at the rate of six per cent. (6%) per annum from the time or times of such respective payments, and the trustees shall have a lien therefor on the vessel prior to the lien of the bonds."

None of these sinking fund payments was ever paid.   When the first interest payment became due on November 15, 1919, Lyon Co. purchased the coupons which were afterwards redeemed by American Co. The amended petition does not state, nor does the record anywhere show, when these coupons were redeemed.   When the second interest payment became due on May 15, 1920, Lyon purchased coupons to the amount of $8,750, and, at the time when the amended petition was verified on November 1, 1921, Lyon Co. was the owner and holder of these coupons.

Duncan & Mount were attorneys for the trustee and Lyon Co., and it is alleged that Lyon Co., in conjunction with the trustee and with these attorneys, attempted to formulate plans to bring about a payment by American Co. of the sinking fund and plans for the successful operation of the Trolltind.   Thereafter followed conferences and correspondence until on March 11, 1920, there was a conference in Pittsburgh between Mr. Lyon, vice president of Lyon Co., counsel (who throughout were other than present counsel) and the trustee, with reference to bringing foreclosure proceedings and obtaining the appointment of a receiver, and Lyon Co. recommended Mr. David Cohen as receiver. Prior to his conference Johnson & Higgins, insurance brokers, had notified Lyon Co. that underwriters to the extent of 25 per cent. of the full values and $35,000 on disbursements had served cancellation notices effective March 4th and March 6th, and that Johnson & Higgins expected others to follow.   Shortly after March 11, 1920, Lyon Co. guaranteed the payment of the account of Johnson & Higgins of the insurance premiums, amounting to approximately $9,600, and it was agreed between the trustee and Lyon Co. that:

"Any amounts so guaranteed, when advanced, should be paid by the petitioner [Lyon Co.] herein under section 8 of article IV of the mortgage hereinbefore set forth.   *   *   *"

Under date of March 19, 1920, in a letter to Duncan & Mount, Lyon Co. confirmed its agreement to guarantee the sums necessary to pay the insurance premiums, and stated that the payment would be made to Duncan & Mount by the trustee, and that Lyon Co. would in turn make payment to the trustee.   On March 26, 1920, in a suit in the District Court for the Southern District of New York, whose jurisdiction was based on diversity of citizenship, Cohen was appointed receiver.   In a petition by the receiver for leave to borrow certain moneys from

Lyon Co., it appeared that when he took possession of the Trolltind the vessel was at Newcastle-on-Tyne, England; that there were maritime liens and disbursements amounting to $25,000; and that the entire cash in the hands of the receiver was $74.37.

At various conferences with Duncan & Mount and the receiver, the receiver determined (which, of course, meant nothing more than that the receiver would apply for leave) to issue $85,000 of receiver's certificates for the purpose of paying off liens on the Trolltind and for placing new insurance thereon, which certificates should be a lien prior to the lien of the mortgage. The amended petition further alleged that it was at all times agreed between Lyon Co. and the receiver and Duncan & Mount that any moneys advanced to the receiver by the trustee under section 8 of article IV of the mortgage, through the medium of the trustee, or by Lyon Co., as a person interested in the trusts, were secured by a lien pursuant to such section prior to the lien of the mortgage.

On April 7, 1920, Lyon Co. advised the trustee that the receiver desired to issue $85,000 of receiver's certificates, and the trustee sent a letter and telegram to Duncan & Mount. The letter read in part as follows:

"We have wired you * * * that we will sanction an application of this kind. Of course we feel that this is a matter for the receiver and the court to determine, and our sanction is neither more nor less than the statement that we do not object to this action, and so far as we have any knowledge of the situation or judgment in the matter it seems to us to be a wise one. We, however, in no way speak or intend to speak for the bondholders in this situation, as we have no instructions from them."

The telegram read:

"As trustee under the mortgage of American Motorship Company we sanction application of receiver for leave to issue eighty-five thousand receiver's certificates motorship Trolltind."

Some time after the receipt of the letter and telegram, supra, a conference was had with the District Judge, but for reasons which do not appear the certificates were not issued. On April 16, 1920, Lyon Co. loaned $10,000 to the receiver, after the latter had notified Lyon Co. that there were pressing libels and maritime liens against the vessel in England, which it was necessary to pay off immediately to preserve the property, and the receiver stated that he would issue receiver's certificates for such amount as soon as authorized by the court. The trustee was notified that Lyon Co. were advancing this sum of $10,000 to the receiver, and the receiver, under date of April 19, 1920, wrote a letter to Lyon Co., stating:

"I am in receipt of your check for $10,000 on account of receiver's certificates motorship Trolltind."

During April and May, 1920, there was further correspondence, which indicated, inter alia, that Lyon Co. advanced the $10,000 on the faith of receiving receiver's certificates, prior in lien to the lien of the mortgage, and which also made clear the continuous parlous situation of the Trolltind in England. On May 10, 1920, there was a conversation

in which Lyon Co. informed the receiver that it would not advance any further moneys without security and authorization of the court, that receiver's certificates for the $10,000 had not been forthcoming, and that Lyon Co. did not desire to purchase receiver's certificates because of the indefiniteness of time of payment, but that it would advance further funds, which had been requested, provided that an assignment of the collect freight which it was expected the vessel would earn on a voyage from England was made as additional security. The receiver assured Lyon Co. at that time that this collect freight shortly due would enable him to repay the $10,000 and the requested additional $20,000 within a few weeks. Under date of May 14th, and upon the application of the receiver an order was made by the District Court, the important part of which is quoted in the margin.[1]

On May 14, 1920, $20,000 was loaned by Lyon Co. to the receiver; the procedure being that the trustee, pursuant to arrangement, loaned Lyon Co. $20,000 upon security of the order of May 14, 1920, and Lyon Co. then loaned this sum to the receiver as aforesaid. On July 29, 1920, Lyon Co. loaned the further sum of $3,500 to the receiver, and on July 1, 1920, paid Johnson & Higgins, at the request of the receiver, the $9,600 which had been previously guaranteed. Before the cargo could be loaded for which the receiver expected the collect freights referred to supra, Great Britain declared an embargo on coal, which automatically canceled the cargo. After some months, the receiver decided to apply for authority to bring the vessel to the United States in order to obtain a cargo, and when the vessel arrived here the receiver obtained a cargo at Norfolk, Va., for a South American port and received collect freight therefor amounting to somewhere between $35,000 and $40,000. No assignment of these freights was made to Lyon Co., and it is alleged that the receiver expended the money collected on these freights on behalf of the vessel and to protect the in-

---

[1] "Ordered that the said receiver * * * is hereby authorized and empowered as such receiver, and for the purposes aforesaid, to wit, for the purpose of paying the expenses and indebtedness already incurred by the said vessel, which constitute maritime liens, and to pay the expenses already incurred by the receiver in the management of the said vessel, and for paying the continuing and accruing expenses of said management, to borrow a sum not to exceed $35,000 from Messrs. Lyon, Singer & Co., * * * to be used by him as such receiver as hereinafter provided, * * * and as security for such loan to assign to * * * Lyon, Singer & Co., the future freights or earnings of the said vessel not to exceed the amount actually advanced to the receiver by said Lyon, Singer & Co. under the terms of this order, and in addition thereto the sum of $10,000, which has already been advanced to the said receiver by * * * Lyon, Singer & Co.; and it is further ordered that the proceeds of the said loan shall be applied, first to the payment of claims which constitute or would constitute maritime liens against the said vessel; second, to the payment of necessary expenses incurred and to be incurred by the receiver up to the time of the sailing of the motorship Trolltind from the port of Newcastle-on-Tyne, England; and, third, to the payment of such insurance premiums which may have been guaranteed by Lyon, Singer & Co. in order to maintain in force and effect insurance on said vessel up to May 16, 1920. * * *"

287 F.—6

terest of the trustee and the bondholders and keep the vessel in operation.

About November 11, 1920, a fire broke out on the vessel at Norfolk, which made it necessary to sink the vessel in that harbor. The vessel was subsequently raised and sold at marshal's sale for $3,450. The insurance policies, which were kept in force by the payment by Lyon Co. of $9,600, were made payable to the receiver, and the receiver expects eventually to collect over $100,000 on these policies. Except for the money which may come from these policies, the receiver has no property nor assets with which to repay the advances and loans made to him by Lyon Co. There has, however, been paid to Lyon Co. $8,952.77 on account of the $9,600 paid to Johnson & Higgins, leaving a balance due on that account of $467.23, with interest from July 1, 1920.

In July, 1920, the receiver requested Lyon Co. to loan him additional moneys for the operation of the vessel and to pay off the maritime liens, and Lyon Co. considered lending the receiver $15,000 upon certain conditions. On August 6, 1920, with the consent of the trustee, an order was entered in the District Court authorizing the receiver to borrow $15,000 additional from Lyon Co., and further authorizing him to issue receiver's certificates to an amount not exceeding $35,000, to be sold and then used exclusively for the purposes of paying insurance premiums on the vessel. About March 30, 1921, the trustee called a meeting of the bondholders, but it does not appear that this committee participated formally in any of the court proceedings to which reference has been made. Apparently they first appeared (though not by formal order) in the present proceeding. The relief prayed for by Lyon Co. was, in brief, for an order directing the receiver to execute receiver's certificates for the $10,000, the $20,000, the $3,500, and the $467.23, with appropriate interest, which certificates should be ahead of the mortgage in lien upon the proceeds of the insurance policies or any other assets in the hands of the receiver.

While the District Court denied the motion for rearguments, it granted the relief prayed for. It was assumed in the opinion of the court that Lyon Co.'s money was used to pay off maritime liens and insurance premiums, and the court stated, if the bondholders wished to question that fact, they might do so before a master. The fact has not been questioned, and consequently we understand that all of the money now sought to be recovered through the instrumentality of these receiver's certificates was utilized, in effect, to pay off maritime liens and insurance premiums.

[1, 2] In our view of the case, the $10,000 is in a different position from the rest of the advance, although the result will be the same as ordered below. It will be remembered that the amended petition alleged that Lyon Co. loaned the $10,000 on April 16, 1920. While there is an allegation that Lyon Co. purchased the coupons which became due on November 15, 1919, and that these were afterwards redeemed by defendant, there is no allegation that Lyon Co. was the owner of these coupons on April 16, 1920. We cannot assume that it was then the owner. At that time Lyon Co. was not "interested in the

trusts," as referred to in article IV, section 8, because the interest there mentioned must be a financial interest, and not, as argued by counsel for Lyon Co., the mere moral interest of Lyon Co. in endeavoring to safeguard the bondholders. The order of May 14, 1920, is of no service to Lyon Co., because it distinctly confined the security to an assignment of the future freights or earnings of the vessel, and so, also, the order of August 6, 1920, is not available to Lyon Co., because that order was strictly limited in its scope, and the $10,000 had not been advanced on the faith of that order.

[3] A court of equity, however, could, and in this case did (order of November 22, 1921), in the exercise of sound discretion, authorize the issuance of receiver's certificates to cover this $10,000, in view of the promises of the receiver, when connected with the purposes for which this sum was borrowed and expended. It is entirely plain from the record that the trustee was fully aware of this loan of $10,000, and of the exigencies which made such a loan vital to the preservation of the vessel, and consequently that Lyon Co. had loaned this money, not only at the request of the receiver, but also with the approval of the trustee. The status of receiver's certificates is determined by order or decree of court, and, if there had been advances made by others subsequent to this advance of $10,000, such other persons, in the absence of actual notice, would have gleaned no protective nor safeguarding information from the order of May 14, 1920.

Nothing, however, stood in the way of a court of equity carrying out by its order the promise of the receiver, known and consented to by the trustee, and doing justice in that regard, unless it can be said that certain familiar cases, such as American Engineering Co. v. Metropolitan By-Products Co. (C. C. A.) 275 Fed. 34, Id. (C. C. A.) 280 Fed. 677, and In re J. B. & J. M. Cornell Co. (D. C.) 201 Fed. 381, require another conclusion. In these cases, one of the vital points was that the receivers were continuing business in the speculative effort of making the receivership estates solvent, or at least of increasing their assets, and, in these cases, there was no appropriate consent by the mortgage trustees.

[4] In the case at bar, the only person with whom Lyon Co. or the receiver could deal was the trustee. There is no obligation on the part of a person advancing money, or of a receiver to whom it is advanced, to obtain the consent of bondholders, not parties to the suit. Such a course would be impracticable from a business standpoint, and is not necessary as matter of law. The trustee is the holder of the legal title of the mortgage, and whether or not bondholders or (as usual) a committee thereof shall be parties to the suit is a matter of judicial discretion, to be exercised, as all the facts and circumstances may require, when and if the bondholders ask to be heard. The court, in circumstances such as these at bar, can only deal with parties.

We need not stop to consider whether Lyon Co. became subrogated to the position of the holders of the maritime liens, because the District Court was fully justified in ordering the receiver's certificates in respect of the sum of $10,000 on the uncontradicted facts which this record discloses. In regard to the remaining sums, the court below was

right in concluding that receiver's certificates would be justifiable only if Lyon Co. could avail of article IV, section 8, of the mortgage, and that there was nothing in the various orders of the court, dehors this provision, which would justify the issuance of receiver's certificates now prayed for.

[5] The first question is whether Lyon Co. was a "person interested in the trusts hereof on account of any taxes, charges, assessments, liens, insurance premiums, or otherwise." The mortgage, in article I, section 6, thereof, has the familiar provision that:

"No coupon belonging to any bond issued hereunder, which in any way, at or after maturity, shall have been transferred or pledged separate and apart from the bond to which it pertains, shall, unless accompanied by such bond, be entitled, in case of a default hereunder, to payment or to any benefit of or from this Indenture, except after the prior payment in full of the principal of the bonds issued hereunder and of all coupons not so transferred or pledged."

This provision, of course, refers solely to marshaling, but it still leaves the coupon holder as a person interested in the trust, for there is always the possibility of payment of the coupons, if the proceeds of the foreclosure are sufficient to reach that far. The case is an excellent illustration of the value of such a provision as article IV, section 8, which may enable the mortgagee to prevent foreclosure by borrowing from a lender, who acts on the faith of this provision. It will be noted, also, that the language is very broad. It relates, not only specifically to taxes, etc., but also to payments "or otherwise."

[6] The second question is whether, because article IV, section 8, requires that the owner will pay the trustee, a lender who is an interested person may avail of this section. This provision merely sets forth simple machinery whereby the owner may, in all such transactions, pay to the trustee, and the trustee in turn pay to the person interested in the trusts. In any event, Lyon Co. was a beneficiary of the mortgagor's covenant, in so far as the language provides that the trustee shall have a lien prior to the lien of the bondholders, and, as well put by the learned District Judge:

"Whatever may be thought of that, it is apparent that the lien was created as security for the performance of the covenant, and that it must be coextensive with the covenant itself. If the beneficiary, on any theory one may choose, is entitled to enforce the performance of the promise, he is entitled to enforce it with all its incidental security. Perhaps the best theory is to say that the trustee holds it in trust for the beneficiary, just as he holds the covenant itself."

[7] Finally, it is necessary only to consider whether, in view of the order of May 14, 1920, and the fact that the loans were made by Lyon Co. on the faith of that order, its conduct should be treated as a waiver of the lien. This order could not, in any manner, destroy Lyon Co.'s rights under section 8, supra. The receiver was in possession under the mortgage of the prepaid freights, which were, of course, subject to the lien of the mortgage. Galveston Railroad v. Cowdrey, 11 Wall. 459, 20 L. Ed. 199; Gilman et al. v. Illinois & Mississippi Telegraph Co., 91 U. S. 603, 23 L. Ed. 405; Freedman's

Saving & Trust Co. v. Shepherd, 127 U. S. 494, 8 Sup. Ct. 1250, 32 L. Ed. 163.

[8] The amended petition, as has already been pointed out, states without contradiction that it was understood that Lyon Co. always relied on section 8. The whole procedure was informal, because Lyon Co. and the trustee were co-operating to save the situation, and for some reason the claim of right under section 8 was not brought to the attention of the court in the original petition; but nevertheless, from the record, it may be stated as a fact that there was neither an express nor an implied waiver of Lyon Co.'s rights under section 8. Thus holding, we need not discuss questions of law which might arise, had there been a waiver.

[9] Finally, it is strongly urged that it would be inequitable to allow Lyon Co. to take advantage of the coupon transaction to establish priority over the bondholders. The record fully meets this contention, and it may be said that, if it had not been for the advances of Lyon Co., there might have been no vessel in the United States out of the destruction of which insurance proceeds are or will be available. What Lyon Co. did was to save the vessel when she was covered with liens and behind in her insurance premiums in a foreign port. It is plain that these loans were made primarily in the interest of the bondholders, through a rather fine sense of responsibility on the part of Lyon Co., because they had sold these bonds to some 55 of their customers. The purchase of the coupons now outstanding in their hands may, from this record, readily be inferred to have been one of the many efforts of Lyon Co., without profit to themselves, to save a bad situation, and every equity which would move a court to do justice is in favor of Lyon Co. It was no fault of theirs that the bondholders failed to act promptly, and, as is often the case, the bondholders appeared late upon the scene to ask for first consideration in proceeds, when they themselves had advanced no moneys nor done anything else of a practical nature to save what, in effect, was their own property.

Decree affirmed, with costs.

